Dorothy BEAVER and Stacy J. Beaver, Plaintiffs,

v.

FOAMCRAFT, INC., Grand Prix Karting Assoc., Inc., National Kart News, Inc., Curt J. Paluzzi, and Foamex International, Inc., Defendants.

Foamcraft, Inc., Counter–Claimant,

v.

Dorothy Beaver, Counter–Defendant.

No. 3:96cv0140 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 7, 2002.

Timothy F. Kelly, Dyer, IN, James T. Crotty, Dragica Balac, Chicago, IL, for Plaintiffs.

Philip E. Kalamaros, South Bend, IN, for Defendants.

### *MEMORANDUM AND ORDER*

ALLEN SHARP, District Judge.

This matter is before the court on the Defendants, Grand Prix Karting Association Inc., National Kart News, Inc., and Curt J. Paluzzi (hereinafter collectively referred to as "GPKA"), motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Jurisdiction

is conferred upon this court pursuant to 28 U.S.C. § 1332. For the following reasons GPKA's motion for summary judgment is now **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND [1]

In 1994 the Plaintiff, Dorothy Beaver (Hereinafter "Dorothy"), participated in the annual Elkhart Grand Prix. The Elkhart Grand Prix was a go-kart race organized by GPKA. At some point during the race, a piece of polyurethane foam padding was torn from its base and landing on the race track. The foam padding was used by GPKA as a course barrier. A portion of that padding struck Dorothy in the head. Another portion that landed on the race track caused a multi-kart collision. Dorothy suffered severe injuries as a result of the collision.

Thereafter, in 1996, Dorothy and her husband, Stacey Beaver, filed the above entitled diversity action alleging, *inter alia*, willful and wanton conduct, loss of consortium, misrepresentation and concealment, and failure to warn. In April, GPKA filed an answer denying the material allegations against it relying upon an indemnity agreement entered into between the parties and filed a counter-claim for indemnity provided for in the "Release and Waiver of Liability and Indemnity Agreement" ("Agreement").[2]

In late February 2000, the court empaneled a jury to determine whether Dorothy had in fact executed a release in favor of GPKA under the terms of the Agreement. On March 3, 2000, the jury determined that Dorothy, by her prior actions, manifested the necessary intent to be bound by the release. That finding was later affirmed by the Court of Appeals. See *Beaver v. Grand Prix Karting Ass'n, Inc.*, 246 F.3d 905 (7th Cir.2001). Following that factual determination, this court directed the clerk to enter judgment in favor of GPKA and against Dorothy and Stacey Beaver as to all claims.[3]

As indicated above that final order was then appealed to the Seventh Circuit. *Beaver v. Grand Prix Karting Ass'n, Inc.*, 246 F.3d 905 (7th Cir.2001). The Seventh Circuit held:

In sum, we find a sufficient legal and factual basis to hold Beaver to the terms of the 1994 release. Because that release cannot bar her claim for willful and wanton conduct or her husband's recovery for loss of consortium, we reverse that part of the judgment and remand for further proceedings. *In all other respects the district court's judgment is affirmed.* Each side shall bear its

---

1. The court will borrow substantially from the Seventh Circuit's recitation of the facts in this case and will supply additional facts, not before the Court of Appeals, as needed. *Beaver v. Grand Prix Karting Ass'n, Inc.*, 246 F.3d 905 (7th Cir.2001).

2. Paragraph II of that agreement provides: "HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of them from any loss, liability damage or cost they may incur due to the presence of the undersigned in or upon the restricted area or in any way competing, officiating observing, or working for, or for any purpose participating in the event and wheth-

er caused by the negligence of the releasees or otherwise."

3. As correctly noted by the Seventh Circuit, the original order directing the clerk to enter judgment against the Plaintiffs included the foam padding manufacturers, Foamcraft, Inc. and Foamex International, Inc. See *Beaver*, 246 F.3d at 908 n. 1. However, the court later amended that order removing Foamcraft and Foamex from that judgment. The Plaintiffs have settled all claims involving Foamcraft and Foamex and therefore they are no longer a parties to this action.

own costs. *Beaver*, 246 F.3d at 912. (Emphasis added)

Before the court is GPKA's motion for summary judgment on the willful and wanton claims on behalf of Dorothy and Stacey and the loss of consortium claim on behalf of Stacey. The court will supply additional facts as to each separate claim as needed below.

Curiously, the Beavers have attempted to raise several other claims (i.e. failure to warn, duty to design a safe racetrack, misrepresentation and concealment,) that they contend survived the March 3, 2000 judgment of this court and the subsequent appeal to the Seventh Circuit. The court is unclear as to whether these claims are part of the derivative action on behalf of Stacey or are claims that Dorothy is attempting to revive on her behalf. If these claims are part of Stacey's derivative action that may proceed in accordance with this court's ruling in Part B of the Discussion below. However, if they are merely an attempt to revive claims on behalf of Dorothy they are barred.

## II. STANDARD OF REVIEW

The Beavers must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). They must present "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e) and only if a reasonable jury could render a verdict for them do they defeat summary judgment. *Jordan v. Summers* 205 F.3d 337, 342 (7th Cir.2000). *See Also Vanasco v. National–Louis Univ.*, 137 F.3d 962, 965 (7th Cir.1998). In determining whether summary judgment is appropriate, the court must draw all reasonable inferences in favor of the nonmoving party, and it

may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovants and all factual disputes resolved in their favor. *Schneiker v. Fortis Insurance Co.*, 200 F.3d 1055 (7th Cir.2000); *Baron v. City of Highland Park*, 195 F.3d 333, 337–38 (7th Cir.1999). The burden of establishing a lack of any genuine issue of material fact rests on the movants. *Wollin v. Gondert*, 192 F.3d 616, 621–22 (7th Cir.1999); *Essex v. United Parcel Service, Inc.*, 111 F.3d 1304, 1308 (7th Cir.1997). The nonmovants, however, must make a showing sufficient to establish any essential element for which they will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999); *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir.1997).

## III. DISCUSSION

### A. "LAW OF THE CASE" DOCTRINE

The "law of the case" doctrine is a long-standing and well taken legal doctrine. It provides that courts should not reopen issues that are decided in earlier stages of the same litigation. See *McMasters v. U.S.*, 260 F.3d 814, 818 (7th Cir. 2001) citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). The practical implications of the doctrine are to promote the finality and efficiency of the judicial process. See *Christianson*, 486 U.S. at 816, 108 S.Ct. 2166 citing 1B J. Moore, J. Lucas, & T. Currier, Moore's

Federal Practice ¶ 0.404[1], p. 118 (1984).[4]

■ A narrow exception to the above doctrine arises only if the court is convinced that the prior decision is "clearly erroneous." *McMasters*, 260 F.3d at 818 citing *Agostini v. Felton*, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting *Arizona v. California*, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Here, it appears, the parties are urging that either the doctrine does not apply with respect to certain claims or that this narrow exception is applicable. GPKA urges that a decision by the Indiana Supreme Court subsequent to the decision of the Seventh Circuit in this case falls within the "clearly erroneous" exception.

As discussed above, the Beavers are still asserting various claims based upon GPKA's breach of duty with respect to design and safe use of the racetrack. However, these claims were disposed of by the court's order after the jury determined that a valid waiver/release of these claims existed.[5] Any effort on behalf of the Beavers to somehow assert that this court's prior final order did not cover these claims with respect to the Beavers' claims against

GPKA is without merit. These claims were specifically addressed in the Seventh Circuit's opinion. The court's decision with respect to these claims were affirmed with the exception of the loss of consortium claim and wanton and willful claim.

It appears that the Beavers contend that some of these claims somehow escaped the "law of the case" doctrine as established by the Seventh Circuit's opinion in this case. However, any claim that was not addressed by the Seventh Circuit was apparently waived by the Beavers on appeal and therefore cannot be raised now. The Seventh Circuit has consistently held that a party's failure to address a claim in its opening brief results in a waiver of that issue. See *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 665 (7th Cir.1998) citing *Sere v. Board of Trustees of the Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir.1988) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel. . . . We consistently and evenhandedly have applied the waiver doctrine when appellants have

---

4. Counsel for the plaintiffs appear to run very close to the line in violating the spirit of this rule by reinstituting some of the very claims dispelled by this court as well as the court of appeals. Specifically, the misrepresentation and concealment claims that were addressed by the Seventh Circuit. See *Beaver*, 246 F.3d at 911.

5. The court's March 3, 2000 order entering judgment against the Plaintiffs was based upon the jury's conclusion that a valid release was entered into by the parties. That release relieved GPKA of any liability because the complained of conduct (i.e. claims based upon a negligence or strict liability theory) and the type of accident that occurred were clearly contemplated by, and within the scope of the release. See *U.S. Auto Club, Inc. v. Smith, infra,* 717 N.E.2d 919, 923–24 (Ind.Ct.App.1999)(Participant's wife filed a wrongful death action against race promoter

for negligence, *inter alia*, alleging that the design of the track and crowd control measures in the infield pits were inadequate. Court found that the release participant executed barred wife's wrongful death claims for negligence against race promoter.) *Schlessman v. Henson*, 413 N.E.2d 1252, 1253, 83 Ill.2d 82, 46 Ill.Dec. 139 (Ill.1980)(claims for negligent design and operation of racetrack found to be released in light of the exculpatory agreement signed by the parties.) See also *Kellar v. Lloyd*, 509 N.W.2d 87, 95, 180 Wis.2d 162, 182–83 (Wis.Ct.App.1993)(finding that release barred all negligence claims "even though [participant] may not have contemplated all of the possible causes of racing accidents in exchange for the opportunity to participate . in the races."). Therefore the scope of the release covers all of the Beavers' claims with the exception of the wanton and willful claim and loss of consortium claim.

failed to raise an issue in their opening brief." (internal quotations and citations omitted)). Therefore, the law of the case limits the claims of the Plaintiffs to the loss of consortium claim on behalf of Stacey Beaver and the wanton and willful claim remaining with Dorothy Beaver.

## B. LOSS OF CONSORTIUM CLAIM

■ The Seventh Circuit reversed the part of this court's judgment as it applied to Stacey's loss of consortium claim. See *Beaver*, 246 F.3d at 911–12. The panel determined that although Dorothy could not assert her various claims because of the release; the release did not prevent Stacey from asserting his loss of consortium claim. *Id.* In doing so, it relied on *Rosander v. Copco Steel & Eng'g Co.*, 429 N.E.2d 990, 991 (Ind.Ct.App.1982); see also *Board of Comm'rs of Cass County v. Nevitt*, 448 N.E.2d 333, 341 (Ind.Ct.App. 1983). At that time the panel expressed its concern with the wisdom of that particular rule, but noted that "it is our job to apply Indiana law, no rewrite it."

GPKA seizing upon a decision by the Indiana Supreme Court, subsequent to the Seventh Circuit's decision in this case, urges this court to take the position that a claim for loss of consortium is a derivative claim which will fail when the spouse's cause of action for personal injury fails. In *Durham v. U–Haul International*, 745 N.E.2d 755, 757 (Ind.2001), the Indiana Supreme Court held that the "wrongful death statute provides the only remedy against a person causing the death of a spouse and there is no independent claim against this person for loss of consortium." The Indiana Supreme Court supported its holding based on the fact that "if a spouse's case survived in a claim that would be barred if brought by the injured person, a number of legislative policy calls would be circumvented." *Id.* at 764.

Those specific legislative enactments were addressed by the state assembly through the creation of the Indiana wrongful death statute. See Ind.Code §§ 34–23–1–1 (et seq). Similarly, the Court noted that workmen's compensation statute could be circumvented if a spouse of an injured worker were allowed to bring a separate claim for loss of consortium against the injured spouse's employer. *Id.* at 765 citing *Wine–Settergren v. Lamey*, 716 N.E.2d 381, 390–91 (Ind.1999).

However, neither *Durham* nor *Wine–Settergren* address the precise legal issue presented by the facts in this case. First, both cases dealt with statutes providing the necessary framework for analysis. *Durham* at 765; *Wine–Settergren* at 390–91. Here the claims on behalf of Dorothy do not fall under any statutory framework where the loss of consortium claim on behalf of Stacey would act in a contravening way to a particular legislative act as the case in *Durham* and *Wine–Settergren*. Second, in *Durham* the Court expressly limited their holding to an independent claim for loss of consortium involving the wrongful death statute. *Durham* at 757. While the language of the opinion suggests that a spouse's loss of consortium claim would fail if the personal injury claim fails, the holding is limited to situations involving a wrongful death claim by a spouse; a situation that does not present itself under the facts of this case.

Furthermore, the court is not prepared to violate the "law of the case" doctrine that expressly found that such a loss of consortium claim was viable. The Seventh Circuit made this determination base upon its analysis of Indiana law. The cases relied upon by the panel in *Beaver* were not expressly overruled by the Indiana Supreme Court in *Durham*. *Durham* at 757. Furthermore, *Wine–Settergren*, the case relied upon by the Indiana Supreme

Court in determining that an independent claim for loss of consortium claim was a derivative claim, was decided well before the Seventh Circuit's decision in this case and yet the panel arrived at the conclusion that such a claim remained viable. *Wine–Settergren,* 716 N.E.2d at 381. This court shares the same reservations as to the wisdom of this outcome, however given that no decision of the Indiana Supreme Court has held otherwise given the same facts presented in this case; the "law of the case" doctrine obligates this court to allow Stacey Beaver to proceed with his loss of consortium claim.

■ However, as a practical matter the above statement fails to achieve the ultimate objective ·of the Plaintiffs (i.e. that being compensated by the Defendants for their negligence under a loss of consortium claim.). The Seventh Circuit panel's decision also stated that "Our decision [involving the loss of consortium claim] may have little practical effect, however, because Beaver agreed in the release to indemnify the race organizers for any liability they incur due to her participation in the race. Thus, any recovery by Beaver's husband will ultimately be paid by Beaver herself." *Beaver,* 246 F.3d at 912 n. 3. This statement of law and fact is also part of the "law of the case" and cannot be overlooked by the Beavers. Thus, any attempt to pursue this claim would be futile because even if Stacey Beaver were to be successful in proving that GPKA was liable under a loss of consortium claim any recovery would be paid by Dorothy. Therefore, GPKA's motion for summary judgment on the loss of consortium claim is **DENIED.** However, the court strongly suggests that counsel for the Plaintiffs engage in serious reality therapy before pursing this claim, which at the end of the day would waste not only the court's time, but also the time and money of the parties involved and may

subject the plaintiffs to further costs and expenses of GPKA's counsel.

## C. WANTON AND WILLFUL CLAIM

■■ The Indiana Supreme Court has clearly outlined the necessary requirements for a claim of a wanton and willful act. *Witham v. Norfolk & W. Ry. Co.,* 561 N.E.2d 484, 486 (Ind.1990); *Miner v. Southwest School Corporation,* 755 N.E.2d 1110,1113–14 (Ind.Ct.App.2001). In *Witham,* the Court described such an act as "an intentional act done with the reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time." *Id.* Furthermore, an omission of an act can also arise to the level of wanton and willful if an actor fails to act with actual knowledge of the natural and probable consequences of injury and has the opportunity to avoid the risk. *Id.*

■ A commission or omission of a wanton or willful act consists of two elements. *Witham,* 561 N.E.2d at 486. First, the defendant must have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury. *Id.* Second, the defendant's conduct must have exhibited an indifference to the consequences of his own conduct. *Id.* Unlike a pure negligence action, a wanton and willful claim requires a certain mental state or element. See *Miner,* 755 N.E.2d at 1114. "[A] party must intentionally act with 'the reckless disregard of the natural and probable consequences of injury.'" *Miner* at 1114 citing *Witham* at 486.

In *Miner,* a case involving an automobile accident at an intersection, the Indiana Court of Appeals determined that nothing in the defendant's conduct demonstrated "reckless abandon" when he decided to proceed through an intersection without looking out for other vehicles. *Miner* at

1114. The court found dispositive the following facts: 1) the plaintiff failed to come forward with evidence that the defendant knew her car was approaching the intersection and would probably turn into his path; 2) the plaintiff further produced no evidence that Miller saw other vehicles as he approached the intersection that would make probable his act of accelerating through the intersection a known danger which would result in probable injury. *Id.* In sum, the court determined that nothing in the defendant's conduct rose to the level of an act of indifference to the consequences of a known danger. *Id.*

In *U.S. Auto Club, Inc. v. Smith,* 717 N.E.2d 919 (Ind.App.1999), the Indiana Court of Appeals was called upon to address a claim involving wanton and willful conduct on the part of a race promoter. In *U.S. Auto* the plaintiff's husband was watching the race in the pit area; when suddenly a driver lost control of his midget car and veered into the pit area striking him. *U.S. Auto Club, Inc.,* 717 N.E.2d at 921. At the summary judgment level, the trial court determined that fact issues remained as to whether there was a defect in the design of the racetrack. *Id.* at 922. Reversing that finding, the Court of Appeals determined that no evidence existed to support the finding that race promoter acted intentionally, knew of the impending danger, or that its conduct showed an indifference to the resulting consequences. *Id.* at 924.

In *U.S. Auto,* the plaintiff had offered several experts' testimony to demonstrate that the race promoters' conduct rose to the level of wanton and willful. *Id.* at 924. The various experts concluded that the safety designs of the racetrack were "reprehensible" because of the "grossly inadequate barrier protection for the infield and pit areas." *Id.* The Court of Appeals noted that the evidence offered "by the experts failed to identify any specific factual evidence or foundation to support their conclusions" that the race promoters knew their conduct was improper. *Id.* Further the Court of Appeals found compelling that "no evidence existed that would indicate that the race promoter disregarded the safety of individuals in the infield pit area, much less that it was willing to allow injuries to those in the pit area." *Id.* at 925.

Here in order to prevail on a claim for wanton and willful conduct, Dorothy must produce evidence that demonstrates GPKA acted with knowledge of an impending danger and then showed a reckless indifference to the resulting consequences. See *Miner* 755 N.E.2d at 1113–14; *U.S. Auto Club, Inc.,* 717 N.E.2d 919. First, no evidence exists that GPKA had prior notice, warning or knowledge that the use of the foam was inadequate as a safety barrier or that injuries from the use of the foam were likely or probable. Rather the facts demonstrate that while GPKA may have been negligent in its design of the track and use of the foam, the evidence in the record belies any assertion of greater malfeasance.

In 1992, Paluzzi began to consider the use of additional safety barriers to supplement the hay bales and concrete walls used around the racetrack. (Paluzzi Dep. pp. 33–46). In 1993, Paluzzi purchased several polyurethane foam blocks ("foam") that were suggested and provided by the McFall Company a local distributor of the foam. According to Paluzzi, the foam was then subjected to a series of impact tests at the Elkhart Street Department and concluded that the foam could be used along the course to cushion the blow for the driver and serve as a protective barrier around the track as well. (Paluzzi Dep. pp. 46–48; 53–61.)

The foam was used in the 1993 race in Elkhart and successfully cushioned impacts at the chicanes [6] in that race. (Terry Riggins Dep. pp 35–36, 46). According to Paluzzi and others, the foam cushioned go-kart accidents, dissipated the energy of the vehicles, slowed go-karts that ran off the track and did so without damaging the go-karts or injuring any driver. (Paluzzi Dep. p. 76; Riggins Dep. p. 40; Mark Kuta Dep. pp. 21–22, 100; Kevin Greer Dep. p. 14). More importantly the foam appeared to have prevented even more serious bodily injuries. (Id.). Because of its performance Paluzzi decided to use the foam again during the 1994 race. (Paluzzi Dep. pp. 232–233).

For the 1994 race, Paluzzi requested bigger, heavier and bulkier foam but otherwise identical to the foam used in the 1993 race. (Paluzzi Dep. pp. 85–87.). The race director testified that the foam used in the 1994 race enhanced the safety of the track and the other safety barriers. (Riggins Dep. p. 111). Further according to several individuals involved with the race the foam worked as intended in the 1994 race by absorbing the impact energy of the go-karts. (Kuta Dep. pp. 100, 123; Paluzzi Dep. p. 252; Greer Dep., pp. 10,11, 52; Don Janowski Dep. pp. 151–52).

Dorothy participated in both the 1993 and 1994 race. Dorothy did not raise any concerns with respect to the use of the foam during the 1993 race, during her investigation of the track prior to qualifying in 1994, or during her qualification or practice sessions for the 1994 race. (Dorothy Dep. pp. 75, 78–79). Neither Dorothy nor her family raised any safety concerns despite the fact that during practice and qualification for the 1994 race go-karts had hit the foam barriers and knocked foam on to the course and go-karts had spun out after striking the foam barriers. (Dorothy Dep. p. 115; George Buhr, Sr. Dep. pp. 119, 126; George Buhr, Jr. Dep. pp. 104, 107–08; Sandra Buhr Dep. pp. 38–39). Dorothy and her family knew and understood the dangers involving go-kart racing. Most importantly, neither Dorothy nor anyone in her family would participate in a race which they considered unsafe. (Dorothy Dep. pp. 88, 111, 116–18; Stacey Dep. pp. 101–02, George, Sr. Dep. pp. 23, 54).

Dorothy's claim for wanton and willful conduct fails for many of the same reasons pointed out by the court in *U.S. Auto.* Specifically, she fails to come forward with any evidence that GPKA knew that the use of the foam barriers were unsafe and would increase the dangers to the drivers and possibly cause serious injury. A careful review of the briefs and evidence contained in the record fails to show any incidents of injury that occurred as result of the foam barriers prior to Dorothy's accident at that 1994 race that would put GPKA on notice that the use of the foam barriers would result in an impending danger to the go-kart racers, much less any evidence that GPKA would have carelessly disregarded such a situation.

Rather, it is GPKA who has come forward with evidence that the purpose of the foam barriers was to enhance the safety of the track. (Dep. Kevin Greer p. 11; Dep. Mark Kuta, pp. 22,27; Dep. Paluzzi pp. 34, 47–48; Dep. Riggins, p. 111). This conclusion was supported by Richard Moore, the director of the Street Department for the City of Elkhart. (Dep. Richard Moore, p. 23). Although Riggins admits that an impact with the foam barrier could result in a dangerous situation. (Dep.Riggins, pp. 56,

---

6. An obstacle on a racecourse; a series of tight turns in opposite directions in an otherwise straight stretch of a road-racing course.

Merriam Webster's Collegiate Dictionary 197 (10th Ed.1993)

116, 122). Riggins further stated that an impact with any barrier could result in a dangerous situation, i.e. hay barrier or hydro barrier. (Id.). Moreover, Riggins continued to believe that the use of the foam barriers improved the overall track safety, despite the possibility of these dangers. (Dep. Riggins p. 116).

As did the plaintiff in *U.S. Auto Club, Inc,* Dorothy directs the court to the attention of her expert to demonstrate that certain safety rules were not followed. (See L. Daniel Metz, Ph.D. Expert Report Section II.). Dr. Metz vaguely concludes that the foam should have been tested under racing conditions and the failure to do so violates a fundamental tenet of racing. (Id.) However, he then goes on to state that "full-scale crash testing is rare." (See Report; Section II). Furthermore, Dr. Metz has failed to state which safety rules were neglected or avoided by GPKA in testing the foam barriers. While Dr. Metz's conclusions may be correct concerning the use of the foam barriers, his report sheds little light on whether GPKA's conduct in using the foam barriers amounted to an intentional act done with reckless disregard of the natural and probable consequences. See *Witham,* 561 N.E.2d at 486.

As further evidence of GPKA's alleged willful and wanton conduct, the Beavers cite to GPKA's failure to consult with outside experts in engineering and design before using the foam barriers. Interestingly, Dr. Metz's report does not specifically mention this nor does he base any of his conclusions on the fact that GPKA should have consulted with experts in the field of racetrack safety, engineering or design prior to using the foam barriers. However, the record demonstrates that the foam barriers were subjected to some testing by the Elkhart Street Department. Moreover, the record does not reflect any problems arising during the practice and qualifying sessions that would apprize GPKA that the use of foam barriers would result in an unsafe racetrack. As evidenced by Dr. Metz's report the only unacceptable results occurred during the 1994 race. (See Report, Section II). Quite possibly the acts of GPKA amounted to some negligent conduct on their part, however, those acts of negligence were waived by the release.

Dr. Metz also concludes that the shredded foam presented an unreasonably dangerous situation because it would shred and turn into debris along the track. (See Report, Section II). Dr. Metz opined that, "under such circumstances it would be normal ... to temporarily suspend racing operations until the offending foam blocks were removed, the course was cleaned up, and all safety personnel and equipment were back in their designated locations. The suspension would normally be carried out either under red flag or full course yellow conditions." The record is not entirely clear whether GPKA had instituted a full or partial yellow during the period when pieces of the foam barrier were on the racetrack. However, as pointed out by GPKA the other forms of protective barriers presented the same dangers. Straw or hay bales and hydro barriers presented similar although not identical problems when struck. (Riggins Dep. pp. 118–122). The activity of racing involves encountering debris on the track; Dorothy understood and appreciated that risk by undertaking the dangerous activity of go-kart racing.

A careful review of the record fails to provide this court with any evidence that would demonstrate that GPKA knew that by using the foam it would increase the risks for injury during the race and that GPKA was indifferent to those risks. Put simply, the circumstance surrounding the

acts of GPKA both before and during the 1994 race as well as the opinions of the Beavers' expert, Dr. Metz, fail to demonstrate any evidence of wanton and willful conduct on behalf of GPKA. Therefore, GPKA's motion for summary judgment with respect to the wanton and willful claims is now **GRANTED.**

### D. COSTS AND ATTORNEYS FEES

GPKA asserts that it is entitled to the recover of attorney costs and other directs costs pursuant to the terms and conditions of the "Release and Waiver of Liability and Indemnity Agreement." However, at this time the court will wait to address the arguments involving what costs and attorneys fees are recoverable by GPKA until a final resolution of the case is achieved. At that time, the court will address any arguments involving what costs, fees or expenses are recoverable by GPKA.

### IV. CONCLUSION

For the foregoing reasons GPKA's motion for summary judgment is **GRANTED** in part and **DENIED** in part. **IT IS SO ORDERED.**