Benjamin ATKINS, a minor, as the only surviving child of Charis Wilson, deceased, by Alexander Kammer, guardian ad litem, Plaintiff-Appellant,

v.

SWIMWEST FAMILY FITNESS CENTER a/k/a Swimwest School of Instruction, Inc., Karen Kittelson, and West Bend Mutual Insurance Company, Defendants-Respondents.

Supreme Court

*No. 03–2487–FT. Oral argument October 26, 2004.—Decided January 19, 2005.*

2005 WI 4

(Also reported in 691 N.W.2d 334.)

304

305

For the plaintiff-appellant there were briefs by *J. Michael Riley* and *Axley Brynelson, LLP,* Madison, and oral argument by *John M. Riley.*

For the defendants-respondents there was a brief by *Bradway A. Liddle, Sarah A. Zylstra* and *Boardman, Suhr, Curry & Field, LLP,* Madison, and oral argument by *Sarah A. Zylstra.*

An amicus curiae brief was filed by *Patricia Sommer* and *Otjen, Van Ert, Lieb & Weir, S.C.,* Madison, on behalf of Wisconsin Insurance Alliance.

¶ 1. N. PATRICK CROOKS, J. This case is before the court on certification from the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2001–2002).[1] Benjamin Atkins (Atkins) appealed from an order of the circuit court, which granted summary judgment in favor of Swimwest Family Fitness Center a/k/a Swimwest School of Instruction, Inc., Karen Kittelson, and West Bend Mutual Insurance Company (Swimwest).

---

[1] Unless otherwise indicated all references to Wisconsin Statutes are to the 2001–02 edition. Wisconsin Stat. § (Rule) 809.61 states, in relevant part: "The supreme court may take jurisdiction of an appeal or other proceeding in the court of appeals upon certification by the court of appeals or upon the supreme court's own motion."

Atkins filed suit for the wrongful death of his mother, Dr. Charis Wilson (Wilson), who drowned[2] while using Swimwest's lap pool. The circuit court held that the guest registration and waiver form signed by Wilson constituted a valid exculpatory provision, releasing Swimwest from liability.

¶ 2. We conclude that the exculpatory language in Swimwest's form is unenforceable, since it is contrary to public policy. The waiver of liability language is, first, overly broad and all-inclusive. The use of the word "fault" on the form did not make clear to Wilson that she was releasing others from intentional, as well as negligent, acts. Second, the form served two purposes, guest registration and waiver of liability for "fault," and thus failed to highlight the waiver, making it uncertain whether Wilson was fully notified about the nature and significance of the document she signed. Finally, Wilson did not have any opportunity to bargain. If she had decided not to sign the guest registration and waiver form, she would not have been allowed to swim. The lack of such opportunity is also contrary to public policy. Accordingly, we reverse and remand, concluding also that Atkins is entitled to pursue his wrongful death claim.

I

¶ 3. Swimwest is mainly an instructional swimming facility located in Madison, Wisconsin. It is equipped with a lap pool that is open to both members

---

[2] Wilson was found unconscious at the bottom of Swimwest's lap pool. Swimwest employees pulled her from the pool and immediately administered CPR. Wilson was then transported by ambulance to University Hospital, where she died the next day, May 4, 2001. An autopsy revealed that death was caused by an Anoxic Brain Injury, the result of drowning.

and visitors. On May 3, 2001,[3] Wilson, a local physician, visited Swimwest as part of a physical therapy and rehabilitation program. Upon entering the facility, Wilson was assisted at the front desk by Swimwest employee Arika Kleinert (Kleinert). Kleinert informed Wilson that because she was not a member of Swimwest, she was required to fill out a guest registration card and pay a fee before swimming.

¶ 4. Kleinert presented Wilson with the guest registration card. The form was preprinted on a five and one-half inch by five and one-half inch card that also contained a standardized "Waiver Release Statement." This statement appeared below the "Guest Registration," which requested the visitor's name, address, phone, reason for visit, and interest in membership. The entire card was printed in capital letters with the same size, font, and color. The waiver language printed on the card, following the registration information requested, is reproduced below:

### WAIVER RELEASE STATEMENT

I AGREE TO ASSUME ALL LIABILITY FOR MYSELF WITHOUT REGARD TO FAULT, WHILE AT SWIMWEST FAMILY FITNESS CENTER. I FURTHER AGREE TO HOLD HARMLESS SWIMWEST FITNESS CENTER, OR ANY OF ITS EMPLOYEES FOR ANY CONDITIONS OR INJURY THAT MAY RESULT TO MYSELF WHILE AT THE SWIMWEST FITNESS CENTER. I HAVE READ THE FOREGOING AND UNDERSTAND ITS CONTENTS.

---

[3] The actual form signed by Wilson is dated May 2, 2001. The complaint, coroner's report, and Arika Kleinert's affidavit all indicate, however, that Wilson signed the form and was found unconscious in the pool on May 3, 2001. The parties have presumed that the date on the form was incorrect.

309

¶ 5. The guest registration and waiver card had just one signature and date line that appeared at the end of the "Guest Registration" and the "Waiver Release Statement." Wilson completed the requested "Guest Registration" portion and signed at the bottom of the "Waiver Release Statement" without asking Kleinert any questions.

¶ 6. Before entering the pool, Wilson told Dan Kittelson, Aquatic Director of Swimwest, that she did not require assistance getting into the water.[4] She was observed entering the pool by Karen Kittelson, part owner of Swimwest, and the lifeguard on duty. Karen Kittelson testified that she saw Wilson swimming the sidestroke up and down the length of the pool.

¶ 7. Soon after Wilson began swimming, another Swimwest employee, Elizabeth Proepper (Proepper), spotted Wilson lying motionless underwater near the bottom of the pool. Proepper alerted Karen Kittelson, who pulled Wilson from the pool and administered CPR. Wilson died at the hospital on May 4, 2001. An autopsy was performed, and drowning was listed as the official cause of death on the coroner's report.

¶ 8. Atkins, a minor and Wilson's only child, filed a wrongful death action against Swimwest through his guardian ad litem. Atkins' complaint alleged that Swimwest was negligent in the operation of the pool facility, particularly in the management and observation of the pool area, that procedures to safeguard against the risk of drowning were not followed, and that negligence of its employees caused Wilson's death.

¶ 9. The Dane County Circuit Court, the Honorable Michael N. Nowakowski presiding, granted

---

[4] It was established in Atkins' affidavit that Wilson knew how to swim prior to May 3, 2001.

Swimwest's summary judgment motion and dismissed Atkins' wrongful death action. The circuit court concluded that the form Wilson signed was sufficient to absolve Swimwest of any liability for Wilson's death. The court reached its conclusion after considering whether the exculpatory clause was in contravention of public policy.

¶ 10. Atkins appealed the circuit court decision. The court of appeals, Judges Charles P. Dykman, Margaret J. Vergeront, and Paul B. Higginbotham, certified the appeal to this court to clarify Wisconsin law concerning the enforceability of exculpatory clauses in standard liability release forms.

## II

¶ 11. This case involves review of whether the circuit court appropriately granted Swimwest's motion for summary judgment. In reviewing the grant of summary judgment, we apply the same methodology used by the circuit court in deciding the motion. *Yauger v. Skiing Enters., Inc.*, 206 Wis. 2d 76, 80, 557 N.W.2d 60 (1996); *see Richards v. Richards*, 181 Wis. 2d 1007, 1011, 513 N.W.2d 118 (1994). Although the standard for our review is de novo, we benefit from the analysis of the circuit court. *Yahnke v. Carson*, 2000 WI 74, ¶ 10, 236 Wis. 2d 257, 613 N.W.2d 102. Wisconsin Stat. § 802.08(2) states, in relevant part, that the circuit court may appropriately grant summary judgment if evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

¶ 12. This case turns on the interpretation of Swimwest's guest registration and waiver form, and

311

whether it relieves Swimwest of liability for harm caused by its negligence. *Merten v. Nathan*, 108 Wis. 2d 205, 210, 321 N.W.2d 173 (1982). Wisconsin case law does not favor such agreements. *Richards*, 181 Wis. 2d at 1015; *Dobratz v. Thomson*, 161 Wis. 2d 502, 468 N.W.2d 654 (1991). While this court has not held that an exculpatory clause is invalid per se, we have held that such a provision must be construed strictly against the party seeking to rely on it. *Yauger*, 206 Wis. 2d at 81; *Merten*, 108 Wis. 2d at 210–11.

■

¶ 13. Generally, exculpatory clauses have been analyzed on principles of contract law, *see Dobratz*, 161 Wis. 2d 502; *Arnold v. Shawano County Agr. Soc'y*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983), *overruled on other grounds*, *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 317, 401 N.W.2d 816 (1987), and on public policy grounds. *See Yauger*, 206 Wis. 2d 76; *Richards*, 181 Wis. 2d 1007; *Merten*, 108 Wis. 2d 205; *see generally*, Restatement (Second) of Contracts, § 195 (1981).[5] How-

---

[5] Restatement (Second) of Contracts § 195 states, in relevant part:

(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if:

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

ever, lately the contractual analysis has not been emphasized, as many of the factors previously reviewed on a contractual basis were reached in the more recent cases, like *Richards* and *Yauger*, on public policy grounds. *Yauger*, 206 Wis. 2d at 86. For a contractual inquiry, we need only "look to the contract itself to consider its validity. Specifically, we examine the facts and circumstances of [the] agreement . . ." *Arnold*, 111 Wis. 2d at 211, to determine if it was broad enough to cover the activity at issue. If not, the analysis ends and the contract should be determined to be unenforceable in regard to such activity. If the language of the contract does cover the activity, as it does here, we then proceed to an analysis on public policy, which remains the "germane analysis" for exculpatory clauses. *Yauger*, 206 Wis. 2d at 86.

¶ 14. We generally define public policy as " 'that principle of law under which freedom of contract or private dealings is restricted by law for the good of the community.' " *Merten*, 108 Wis. 2d at 213 (quoting *Higgins v. McFarland*, 196 Va. 889, 86 S.E.2d 168, 172 (1955)). In such a review of exculpatory clauses, this court "attempts to accommodate the tension between the principles of contract and tort law that are inherent in such an agreement." *Richards*, 181 Wis. 2d at 1016.[6]

---

(3) A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.

[6] The basic principles of contract and tort law as applied to exculpatory provisions were made clear in *Richards v. Richards,* 181 Wis. 2d 1007, 1016, 513 N.W.2d 118 (1994):

The law of contract is based on the principle of freedom of contract; people should be able to manage their own affairs

For guidance on the application of these public policy principles, we examine our two most recent cases considering exculpatory contracts in Wisconsin.

¶ 15. In *Yauger*, this court based its determination of the enforceability of an exculpatory clause on two grounds: "First, the waiver must clearly, unambiguously, and unmistakably inform the signer of what is being waivèd. Second, the form, looked at in its entirety, must alert the signer to the nature and significance of what is being signed." *Yauger*, 206 Wis. 2d at 84. *Yauger* involved a wrongful death action against the owner of a ski hill area. The claim, brought by the parents of a girl who fatally collided with the concrete base of a chair lift tower while skiing, alleged that the defendant negligently failed to pad the lift tower. The defendant filed for summary judgment, relying on the exculpatory provision contained in the family ski pass signed by the girl's father. The waiver read, in part: " 'There are certain inherent risks in skiing and that we agree to hold Hidden Valley Ski Area/Skiing Enterprises Inc. harmless on account of any injury incurred by me or my Family member on the Hidden Valley Ski Area premises.' " *Id.* at 79.

¶ 16. In applying the two factors, the court in *Yauger* held that the release was void as against public policy. First, this court held that the release was not

without government interference. Freedom of contract is premised on a bargain freely and voluntarily made through a bargaining process that has integrity. Contract law protects justifiable expectations and the security of transactions. The law of torts is directed toward compensation of individuals for injuries resulting from the unreasonable conduct of another. Tort law also serves the "prophylactic" purpose of preventing future harm; tort law seeks to deter certain conduct by imposing liability for conduct below the acceptable standard of care. *Id.* (citing *Merten v. Nathan,* 108 Wis. 2d 205, 211–12, 321 N.W.2d 173).

clear because it failed to include language "expressly indicating Michael Yauger's intent to release Hidden Valley from its own negligence." *Id.* at 84. Without any mention of the word "negligence," and the ambiguity of the phrase "inherent risks of skiing," the court held that Yauger was not adequately informed of the rights he was waiving. In regard to the second factor, this court held that the form, in its entirety, did not fully communicate to Yauger its nature and significance, because it served the dual purposes of an application for a season pass and a release of liability. *Id.* at 87. Furthermore, the waiver was not conspicuous. It was one of five paragraphs on the form and did not require a separate signature. *Id.*

¶ 17. In *Richards*, the court adopted a slightly different approach to determining the enforceability of exculpatory contracts. *Richards* involved the wife of a truck driver signing a "Passenger Authorization" release form issued by her husband's employer. The form claimed to waive liability for "intentional, reckless, and negligent conduct." She brought suit to recover for injuries she suffered while riding in her husband's truck as a passenger. We used a combination of factors to determine that the exculpatory language was contrary to public policy. *Richards*, 181 Wis. 2d at 1017. The first factor was that the contract served two purposes, neither of which was clearly identified or distinguished. Second, the court held that the release was broad and all-inclusive. Finally, there was little or no opportunity to negotiate or bargain over the contract. *Id.* at 1011.

¶ 18. Applying the factors from *Yauger* and *Richards*, we hold that Swimwest's exculpatory clause is in

315

violation of public policy.[7] First, this exculpatory waiver, which uses the word "fault," is overly broad and all-inclusive. *Yauger*, 206 Wis. 2d at 85–86; *Richards*, 181 Wis. 2d at 1017–18. Second, the form, serving two functions and not requiring a separate signature for the exculpatory clause, thus not sufficiently highlighting that clause, does not provide the signer adequate notification of the waiver's nature and significance. *Yauger*, 206 Wis. 2d at 86–87. Third, there was little or no opportunity to bargain or negotiate in regard to the exculpatory language in question. *Richards*, 181 Wis. 2d at 1019.[8] Under this framework, the waiver in question is unenforceable as against public policy.

¶ 19. In addressing the first factor, we find the waiver's broadness raises questions about its meaning and demonstrates its one-sidedness. *Id.* at 1018. The language chosen by Swimwest is not clear and could potentially bar any claim arising under any scenario.

---

[7] We acknowledge that *Yauger v. Skiing Enters., Inc.,* , 206 Wis. 2d 76, 557 N.W.2d 60 (1996) and *Richards* place different weight on the public policy factors used to invalidate exculpatory clauses. *See Rose v. Nat'l Tractor Pullers Ass'n, Inc.*, 33 F. Supp. 2d 757, 765 (1998). In *Yauger*, for example, "the presence of a single objectionable characteristic (was) sufficient to justify invalidating an exculpatory agreement." *Id.* On the other hand, in *Richards,* the court stated that "none of these factors alone would necessarily have warranted invalidation of the exculpatory contract." *Richards,* 181 Wis. 2d at 1020; *see Rose,* 33 F. Supp. at 765. Because all of the factors listed in those cases are present here, we do not address whether a single objectionable factor is sufficient to invalidate an exculpatory clause.

[8] According to the court in *Yauger,* it did not address this factor from *Richards* because both of the factors it had already addressed were sufficient to void the exculpatory clause in question. *Yauger,* 206 Wis. 2d 76, 86 n.1.

The waiver begins: "I AGREE TO ASSUME ALL LIABILITY FOR MYSELF WITHOUT REGARD TO FAULT. . . ." This language never makes clear what type of acts the word "fault" encompasses. Although Swimwest alleges that negligence is synonymous with fault, we find that fault is susceptible to a broader interpretation. Fault is currently defined as "[a]n error or defect of judgment or of conduct; any deviation from prudence or duty resulting from inattention, incapacity, perversity, bad faith, or mismanagement." *Black's Law Dictionary* 623 (7th ed. 1999). This definition is broad enough to cover a reckless or an intentional act. A waiver of liability for an intentional act would clearly place the exculpatory clause in violation of public policy. *Merten*, 108 Wis. 2d at 212; Restatement (Second) of Contracts § 195(1) (1981). We again emphasize that exculpatory language must be strictly construed against the party seeking to rely on it. *Yauger*, 206 Wis. 2d at 81.

¶ 20. If Swimwest wanted to make clear that the signer is releasing it from negligent acts, it could have included the word "negligence" in the waiver. While this court has never specifically required exculpatory clauses to include the word "negligence," we have stated that "we consider that it would be very helpful for such contracts to set forth in clear and express terms that the party signing it is releasing others for their negligent acts. . . ." *Dobratz*, 161 Wis. 2d at 525.

¶ 21. Likewise, the broadness of the exculpatory language makes it difficult to ascertain exactly what was within Wilson's or Swimwest's contemplation. We have consistently held that "[o]nly if it is apparent that the parties, in light of all the circumstances, knowingly agreed to excuse the defendants from liability will the contract be enforceable." *Id.* at 520 (citing *Arnold*, 111

317

Wis. 2d at 213). For example, in *Arnold*, we voided an exculpatory clause, because the accident that occurred was not within the contemplation of the parties when they signed the agreement. The case involved a waiver signed by a racecar driver, whereby he agreed not to hold liable the race promoter, the racing association, the track operator, the landowner, and any other driver in the race for injuries arising from the race. The plaintiff was severely injured after he crashed his car, and the rescue personnel sprayed chemicals into his burning car. The fumes that the spray created were toxic and caused the driver severe brain damage. In rendering the exculpatory language unenforceable, we held that "an issue of material fact exists as to whether the risk of negligent rescue operations was within the contemplation of the parties at the time the exculpatory contract was executed." *Arnold*, 111 Wis. 2d at 212.

¶ 22. Like the plaintiff in *Arnold*, Wilson likely would not have contemplated drowning in a four-foot deep pool with a lifeguard on duty, when she signed the guest registration and waiver form. The question is not whether swimming carries with it the risk of drowning, but rather whether Wilson, herself, likely contemplated that risk.

■■■

¶ 23. Here, the guest registration and waiver form does not provide adequate notice of the waiver's nature and significance. *See Yauger*, 206 Wis. 2d at 84. In this case, the form provided by Swimwest served two purposes. It was both a "Guest Registration" application and a "Waiver Release Statement." Just as in *Richards* and *Yauger*, the exculpatory language appeared to be part of, or a requirement for, a larger registration form. In *Yauger*, for example, the plaintiff signed a one-page document that served as an application for a season ski

pass and also contained a release of liability. *Yauger*, 206 Wis. 2d at 87. The waiver in this case could have been a separate document, providing Wilson with more adequate notice of what she was signing. Also, a separate signature line could have been provided, but was not. "Identifying and distinguishing clearly between those two contractual arrangements could have provided important protection against a signatory's inadvertent agreement to the release." *Richards*, 181 Wis. 2d at 1017.

¶ 24. Another problem with the form was that there was nothing conspicuous about the paragraph containing the "Waiver Release Statement." *See Yauger*, 206 Wis. 2d at 87. "The form, looked at in its entirety, must be such that a reviewing court can say with certainty that the signer was fully aware of the nature and the significance of the document being signed." *Id.* at 88. Here, the entire form was printed on one card, with the same size, font, and color. The fact that the release statement is in capital letters is irrelevant since all of the words on the guest registration were also in capital letters. Furthermore, the only place to sign the form was at the very end. This supports the conclusion that the waiver was not distinguishable enough.

¶ 25. We also conclude that there was no opportunity for Wilson to bargain over the exculpatory language in the guest registration and waiver form. According to the deposition testimony of Swimwest employee Kleinert, Wilson had an opportunity to read the form and ask questions. She was told that the form included a waiver, and allegedly took her time reading the card. This information alone, however, is not sufficient to demonstrate a bargaining opportunity. The

form itself must provide an opportunity to bargain. *See Richards*, 181 Wis. 2d at 1019.

¶ 26. We were faced with an analogous situation in *Richards*. In that case, the plaintiff was forced to choose between signing a standardized waiver or not riding with her husband in his employer's truck. The court invalidated the contract, in part, because she "simply had to adhere to the terms of the written form." *Id.* We held that an exculpatory clause would not be enforced when it is part of a standardized agreement that offers little or no opportunity to bargain. *Id.* Similarly, Wilson was without an opportunity to negotiate in regard to the standard exculpatory language used in the form. She was forced to either sign the form or not swim at Swimwest.[9] We hold, therefore, that such an exculpatory clause, where there is no opportunity to bargain in regard to its terms, presents another significant factor in the analysis of public policy.

¶ 27. All of the factors discussed lead us to conclude that the exculpatory clause in the Swimwest form violates public policy, and, therefore, is unenforceable.

III

¶ 28. The final issue we address is whether Atkins is permitted to bring a wrongful death claim against Swimwest. Under Wisconsin law, a wrongful death action may be brought under such circumstances "as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages. . . ." Wis. Stat. § 895.03.[10]

---

[9] In Karen Kittelson's deposition, she states: "You have to pay the fee and sign the waiver. You are not allowed to use the facility unless you sign the waiver."

[10] Wisconsin Stat. § 895.03 states, in relevant part:

¶ 29. As the son of Wilson, Atkins was a proper claimant for a wrongful death claim against Swimwest, pursuant to Wis. Stat. § 895.04.[11] However, because the circuit court determined that Wilson would have been barred from bringing suit, the court consequently determined that Atkins was also barred. While caselaw does establish that wrongful death claims are derivative to any claim Wilson could have maintained, *see Ruppa v. Am. States Ins. Co.*, 91 Wis. 2d 628, 646, 284 N.W.2d 318 (1979), having found the exculpatory clause unenforceable as against public policy, Swimwest is no longer shielded from liability, since Wilson could have brought a claim against it. Accordingly, Swimwest must now face the derivative wrongful death claim filed by her son, Benjamin Atkins.

## IV

¶ 30. In summary, we conclude that the exculpatory language in Swimwest's form is unenforceable, since it is contrary to public policy. The waiver of liability language is, first, overly broad and all-inclusive. The use of the word "fault" on the form did not make clear to Wilson that she was releasing others

Whenever the death of a person shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the person injured; provided, that such action shall be brought for a death caused in this state.

[11] Wisconsin Stat. § 895.04(1) states, in relevant part: "An action for wrongful death may be brought by the personal representative of the deceased person or by the person to whom the amount recovered belongs."

from intentional, as well as negligent, acts. Second, the form served two purposes, guest registration and waiver of liability for "fault," and thus failed to highlight the waiver, making it uncertain whether Wilson was fully notified about the nature and significance of the document she signed. Finally, Wilson did not have any opportunity to bargain. If she had decided not to sign the guest registration and waiver form, she would not have been allowed to swim. The lack of such opportunity is also contrary to public policy. Accordingly, we reverse and remand, concluding also that Atkins is entitled to pursue his wrongful death claim.

*By the Court.*—The decision of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

¶ 31. PATIENCE DRAKE ROGGENSACK, J. (*concurring*). While I agree with the mandate to reverse and remand this matter, I write separately for two reasons: (1) because the court paints with too broad a brush when it strikes down the waiver due to its conclusion that Swimwest Family Fitness Center did not give Charis Wilson the opportunity to bargain on the terms of the release, without explaining that while the opportunity to bargain is desirable, it is not a separate component that may be dispositive of a waiver's validity, and (2) because whether Wilson contemplated the possibility of her own death when she signed the waiver of liability is a question of fact that we should not decide on appeal.

¶ 32. In the absence of legislation that prohibits them, waivers of liability, also known as exculpatory contracts, generally have been upheld. *Arnold v. Shawano County Agric. Soc'y*, 111 Wis. 2d 203, 209, 330 N.W.2d 773 (1983). However, exculpatory contracts,

such as the one Wilson signed to obtain the opportunity to swim in the Swimwest pool, are not favored in the law. *Id.*

¶ 33. When an exculpatory contract is reviewed by a court upon a claim that the contract violates public policy, there is a tension that is always present. On one hand, the court must consider the right to contract freely in the management of one's affairs without government interference, and on the other hand, the court must consider that the shifting of responsibility for a tortfeasor's negligent acts may tend to permit more negligent conduct. *Id.* at 209, n.2. We have balanced this tension by consistently requiring that exculpatory contracts contain two components in order to survive a public policy challenge: (1) a description that "clearly, unambiguously, and unmistakably inform[s the signer] of the rights he [or she is] waiving," *Yauger v. Skiing Enters., Inc.*, 206 Wis. 2d 76, 86, 557 N.W.2d 60 (1996), and (2) a description that "clearly and unequivocally communicate[s] to the signer the nature and significance of the document being signed." *Id.* at 86–87. In regard to these components, releases that serve two purposes and those that are not conspicuously labeled have been held to be insufficient to draw the signer's attention to the fact that he is waiving liability for other parties' negligence, as well as his own. *Richards v. Richards*, 181 Wis. 2d 1007, 1017, 513 N.W.2d 118 (1994). And a release that is so broad as to be interpreted to shift liability for a tortfeasor's conduct under all possible circumstances, including reckless and intentional conduct, and for all possible injuries, catastrophic as well as minor, will not be upheld. *Id.* at 1017–18.

¶ 34. In *Richards*, we also identified a third consideration that may be examined when exculpatory

contracts are reviewed: Whether the injured party has had an opportunity to bargain in regard to the breadth of the release. *Id.* at 1019. However, contrary to our discussion of the two components set out above, which previous cases had evaluated, we offered no citation to precedent that would establish that the lack of an opportunity to bargain is a component necessary to a valid exculpatory contract. Instead, we linked the lack of an opportunity to bargain to the component requiring releases to clearly state the circumstances and scope of injuries contemplated in order to inform the signer of the rights that he or she is waiving. *Id.* at 1019–20.

¶ 35. In a more recent decision where we invalidated a waiver because it "failed to clearly, unambiguously, and unmistakably inform [the signer] of the rights he was waiving," *Yauger*, 206 Wis. 2d at 86, and failed to "clearly and unequivocally communicate to the signer the nature and significance of the document being signed," *id.* at 86–87, we also explained:

> We need not address the third ground articulated in *Richards,* i.e., standardized agreement which offers little or no opportunity for negotiation or free and voluntary bargaining, inasmuch as either of the above principles was sufficient to void this contract.

*Id.* at 87 n.1. In so explaining that a lack of either of the two necessary components set out at pages 86–87 of our decision was sufficient to set aside an exculpatory contract, we chose not to establish as a third and necessary component of a public policy analysis a requirement that there be an opportunity to bargain on the terms of the release. Rather, the lack of an opportunity to bargain was a fact that a court could consider in evaluating the totality of the circumstances surrounding the execution of a waiver.

¶ 36. It is against this background that the majority opinion strikes down the contract between Wilson and Swimwest, while concluding that one of the infirmities leading to invalidation is that Wilson was not given an opportunity to bargain about the terms of the release. Majority op., ¶ 18. It also opines that, "[b]ecause all of the factors listed in [earlier] cases are present here, we do not address whether a single objectionable factor is sufficient to invalidate an exculpatory clause." *Id.*, ¶ 18 n.7. In so doing, it adds the lack of an opportunity to bargain as a component of the public policy analysis, rather as reasoning used to determine whether the release was overly broad, as we employed it in *Richards*. It also implies that the lack of an opportunity to bargain could be sufficient to invalidate a release when it asserts, "The form itself must provide an opportunity to bargain." Majority op., ¶ 25. This is an unnecessary broadening of the law that heretofore has set the framework for the analysis of an exculpatory contract on public policy grounds.

¶ 37. My concern may seem like a minor matter, but it is very important in a practical sense. For example, the reception desk of a recreational facility is not always staffed by the owner of the facility, but rather, it may be staffed by an employee, as was the case here. It would be unrealistic to require that an employee be authorized to "bargain" about the terms of a release of liability, and it would be unrealistic that an owner always be present at the facility. Additionally, what give and take has to occur in order that there be an actual opportunity to bargain? What if a potential swimmer does not want to waive any potential claims for liability, but the owner is able to afford insurance only for catastrophic injuries, does the owner have the right to say that the person cannot swim in his pool?

Those are only a few of the questions that could arise. Accordingly, I would not employ the opportunity to bargain in any way other than in an attempt to determine if the language in the release described the circumstances for which potential liability claims were being waived.

¶ 38. Additionally, in holding that the opportunity to bargain is a component of a contractual waiver, the court has effectively removed the ability of most businesses that operate paid recreational facilities to limit any type of liability by contract. In my view, this will result in an increase in lawsuits and in fewer swimming and other paid recreational facilities for Wisconsin citizens to enjoy, a result that does not further the public good.

¶ 39. Exculpatory contracts may be invalidated on a contractual basis, as well as on a public policy basis, if the injury that occurred was not within the contemplation of the parties when the agreement was signed. *Arnold*, 111 Wis. 2d at 211. As we have explained, "Exculpatory agreements that are broad and general in terms will bar only those claims that are within the contemplation of the parties when the contract was executed." *Id.* We have also explained that the determination of what risks the parties to the contract intended to include in the release are questions of fact for the jury. *Id.* at 212.

¶ 40. An overly broad and generally stated release that may prevent the formation of a valid contract because there was no meeting of the minds by the contracting parties presents a question similar to that presented by a failure to establish the components necessary to a public policy analysis. However, under a contract analysis, the question presents as a fact question, unless the facts are undisputed and capable of only

one interpretation, *see Energy Complexes, Inc. v. Eau Claire County*, 152 Wis. 2d 453, 466–67, 449 N.W.2d 35 (1989), and in a public policy analysis the question presents as a question of law, *Richards*, 181 Wis. 2d at 1011. The foundations are so similar that we have cited to cases that were decided under a contract-type analysis as support for a decision based on public policy. *See, e.g., id.* at 1015–16 (a policy-based decision, citing *Dobratz v. Thomson*, 161 Wis. 2d 502, 520, 468 N.W.2d 654 (1991), a contract-based decision).

¶ 41. Here, the contract-formation question presented is whether Wilson contemplated the possibility of her own death when she signed the release. The record provides that she was a swimmer and that the part of the pool in which she was swimming was only about four feet deep. Therefore, if she tired of swimming, all she had to do to keep from sinking below the water's surface was to stand up. Additionally, statements in the coroner's report included in the record, which repeated findings from the autopsy, relate that although Wilson's cause of death is listed as "drowning," she did not die from the aspiration of water into her lungs, as one would expect when breathing continues after a person is submerged under water. The physician who conducted the autopsy labeled this phenomenon a "dry drowning." Although he did not assign any specific finding, such as a heart attack, as the cause of Wilson's failing to breathe, several possibilities were mentioned. Accordingly, there may have been medical circumstances that contributed to Wilson's death that had nothing to do with her being submerged in a swimming pool when she was found unconscious. This presents the court with material factual questions about what risks Wilson contemplated when she signed the release. In my view, there must first be a finding of what caused

Wilson's death before a court can evaluate whether she could have agreed to waive that cause. This cannot be decided on summary judgment.

¶ 42. Furthermore, the majority opinion does not decide that as a matter of law Wilson could not have contemplated the possibility of her own death when she signed the release. Therefore, I would send the case back to the circuit court for determinations of what caused Wilson to stop breathing and whether Wilson and Swimwest intended the release to cover that catastrophic event. In my view, until it is known why Wilson stopped breathing, it will not be possible to determine whether she contemplated that event when she signed the waiver of liability. If the injury-causing event is found to be one that Wilson did not contemplate, the waiver she signed will have no effect on liability for her death.

¶ 43. For the reasons set forth above, I respectfully concur.

¶ 44. JON P. WILCOX, J. (*dissenting*). I dissent. While I certainly do not believe that all exculpatory agreements should be upheld, the majority opinion will render it virtually impossible to enforce any exculpatory agreement in Wisconsin. The majority concludes that the agreement in this case is unenforceable as against public policy for three reasons: 1) the agreement is overly broad; 2) the agreement serves two purposes; and 3) there was no opportunity for the signer to bargain or negotiate over the exculpatory language. Majority op., ¶ 18. These factors originate from this court's decision in *Richards v. Richards*, 181 Wis. 2d 1007, 1017–19, 513 N.W.2d 118 (1994). I disagree with the majority's application of factors one and two and while I am bound to accept the legitimacy of

the third factor, I question the manner in which the third factor is applied in this case. Further, the majority fails to articulate a clear test as to what types of exculpatory agreements are enforceable in this state. The majority applies the above three factors in such a fashion so as to leave little possibility that any exculpatory agreement could be enforceable in this state.

¶ 45. The law governing the enforceability of exculpatory agreements in Wisconsin has been anything but consistent and this court has, through its various articulations of standards applicable to such agreements, failed to ever adhere to a consistent test for determining their validity. While parties wishing to execute such agreements certainly have a plethora of cases explaining when such agreements are not enforceable, our jurisprudence has not provided a beacon for litigants to successfully navigate the rocky waters of this area of the law.

¶ 46. The last time this court had the opportunity to examine the validity of exculpatory agreements in Wisconsin, we noted that our previous cases had used a variety of tests to evaluate the legitimacy of such agreements. *Yauger v. Skiing Enters., Inc.,* 206 Wis. 2d 76, 81–83, 557 N.W.2d 60 (1996). We explained that although our past cases had not adhered to a single test, they all had a single common thread tying them together: "[t]hese cases, in different ways, involved an exculpatory clause that failed to disclose to the signers exactly what rights they were waiving." *Id.* at 81. After analyzing our prior jurisprudence, including *Richards,* this court distilled a two-part test governing the legitimacy of exculpatory agreements:

> While the law grudgingly accepts the proposition that people may contract away their liability right to recovery for negligently caused injuries, the document

must clearly, unambiguously, and unmistakably express this intention. Furthermore, the document when looked at in its entirety must clearly and unequivocally communicate the nature and significance of the waiver.

*Id.* at 88–89. The majority in this case reverts back to the test used in *Richards* while ignoring the lessons of *Yauger.*

¶ 47. Before analyzing the exculpatory agreement, it is important to set forth precisely the nature and contents of the agreement and consider the form on which it appears as a whole.[1] The agreement in question is contained on an index card that is five and one-half inches by five and one-half inches. The card reads:

### GUEST REGISTRATION

NAME_____

ADDRESS_____

CITY_____STATE_____

ZIP_____ HOME PHONE_____

REASON FOR VISIT_____

HOW DID YOU HEAR OF SWIM WEST?_____
_____

I WOULD LIKE MEMBERSHIP INFORMATION?

YES_____ NO_____ DATE_____

---

[1] A copy of the agreement is attached as an exhibit at the end of this dissent.

## WAIVER RELEASE STATEMENT

I AGREE TO ASSUME ALL LIABILITY FOR MY-
SELF WITHOUT REGARD TO FAULT, WHILE AT
SWIMWEST FAMILIY FITNESS CENTER. I FUR-
THER AGREE TO HOLD HARMLESS SWIMWEST
FITNESS CENTER, OR ANY OF ITS EMPLOYEES
FOR ANY CONDITIONS OR INJURY THAT MAY
RESULT TO MYSELF WHILE AT THE SWIMWEST
FITNESS CENTER. I HAVE READ THE FOREGO-
ING AND UNDERSTAND ITS CONTENTS.

SIGNED DATE

That is the entirety of the agreement at question in this case.

¶ 48. The first reason the majority provides for striking down the exculpatory agreement contained on this card is: "this exculpatory waiver, which uses the word 'fault,' is overly broad and all-inclusive." Majority op., ¶ 18. The majority reasons that the language is ambiguous, could potentially cover a variety of claims, does not include the word "negligence," and states that it is unclear whether the risk of drowning was within the signer's contemplation. Majority op., ¶¶ 19–22.

¶ 49. "Fault," as understood by a layperson, is defined as "[a] mistake; an error" or "[r]esponsibility for a mistake or an offense; culpability." *The American Heritage Dictionary of the English Language* 665 (3d ed. 1992). Thus, the clear meaning of the first clause in the waiver is that the signer agrees to assume all liability for herself, without regard to who is respon-sible for any mistake leading to an injury. This language plainly covers negligent conduct. The fact that the legal definition of "fault" covers reckless and intentional acts, majority op., ¶ 19, is not dispositive. As the majority

331

correctly indicates, waivers may not be enforced to prevent liability for reckless or intentional conduct. *Id.* However, neither reckless nor intentional conduct is at issue in this case. The fact that the waiver may be unenforceable as to other tortious acts is not germane; the relevant inquiry is whether "the exculpatory clause . . . fail[s] to disclose to the signers exactly what rights they were waiving[,]" and whether the agreement unambiguously and unmistakably covers the tortious act at issue. *Yauger,* 206 Wis. 2d at 81, 86.

¶ 50. When read in context of the remaining language of the waiver release statement, the meaning of the first sentence, containing the word "fault," becomes even clearer. *See Folkman v. Quamme,* 2003 WI 116, ¶ 28 n.11, ¶ 29, 264 Wis. 2d 617, 665 N.W.2d 857 (words and phrases of a contract are to be read in context of the contract's other language in determining ambiguity). The second sentence of the waiver provides: "I FURTHER AGREE TO HOLD HARMLESS SWIMWEST FITNESS CENTER, OR ANY OF ITS EMPLOYEES FOR ANY CONDITIONS OR INJURY THAT MAY RESULT TO MYSELF WHILE AT THE SWIMWEST FITNESS CENTER." Thus, when the first two sentences of the waiver are read together in context, an ordinary reader would understand that she is agreeing to hold Swimwest harmless for any injuries she suffers while at Swimwest that are due to mistakes or errors for which Swimwest is responsible. In other words, a layperson would understand that the waiver applies to any negligent acts of Swimwest or its employees.

¶ 51. However, the majority argues that the decedent would not have contemplated the injury that occurred, majority op., ¶ 22, and focuses on the fact that the agreement does not contain the word "negli-

gence." Majority op., ¶ 20. The decedent in this case went to a facility called "*Swim*west" in order to *swim laps* as part of her physical therapy. Majority op., ¶ 3. She took her time to read the waiver and then signed it. *Id.,* ¶¶ 5, 25. Yet, the majority somehow concludes that the decedent did not contemplate the risk of drowning. Regardless of whatever other activities the waiver may or may not cover, it is almost inconceivable that a reasonable person would not understand that, at a minimum, a waiver at an aquatic facility would cover the risk of drowning. What else would such a waiver cover if not the risk of drowning?

¶ 52. Must a business list in the waiver each and every conceivable form of negligence that may result in injury to a patron? The majority opinion would seem to so indicate. Majority op., ¶ 22 ("Wilson likely would not have contemplated drowning in a four-foot deep pool with a lifeguard on duty."). Listing the myriad of ways in which the proprietor or its agents could be negligent would be unduly burdensome to a business and would necessitate a waiver that is much more than one page in length. Such a waiver, in addition to being quite lengthy, would certainly not be easy to read or understand.

¶ 53. In *Yauger,* this court cited with approval guidelines originally developed for the Uniform Commercial Code that govern warranty disclaimers. *Yauger,* 206 Wis. 2d at 87 n.2. One of the guidelines is that "the language of the negligence waiver should be readable. . . . and should not be written in legal jargon." *Id.* (quoting Stephanie J. Greer & Hurlie H. Collier, *The Conspicuousness Requirement: Litigating and Drafting Contractual Indemnity Provisions in Texas After Dresser Industries, Inc. v. Page Petroleum, Inc.,* 35 S. Tex. L. Rev. 243, 265–70, Apr. 1994). By focusing on the

absence of a legal term of art in the waiver—
"negligence"—and the fact that the waiver did not
precisely mention the exact negligent act leading to
injury in this case, the majority's rationale runs afoul of
the principle that waivers should be easy to read and
should not contain legal jargon.

¶ 54. Next, the majority concludes that the waiver
does not provide "adequate notice of the waiver's nature
and significance" because it serves two purposes. Ma-
jority op., ¶ 23. The majority states that as in *Richards*
and *Yauger*, the exculpatory language here is part of a
larger registration form. Majority op., ¶ 23. However,
the waiver in this case is part of a simple five and
one-half inch by five and one-half inch index card. The
*only* part of the card containing contiguous complete
sentences is the waiver. The remainder of the form is
comprised of mere blank lines for the reader to fill in his
or her contact information.

¶ 55. Thus, the waiver is the only part of the form
for a patron to read. The form of the waiver in this case
stands in stark contrast to the waiver in *Yauger*, which
was "one paragraph in a form containing five separate
paragraphs" that did not stand out from the other
language. *Yauger*, 206 Wis. 2d at 87. Here, the exculpa-
tory language is the *only* language on the form to be
read. This is not a case where the exculpatory language
is located in fine print at the end of a multi-page
document or even a case where the waiver is located in
the midst of several paragraphs on a single page form.
Aside from the blanks for contact information, the
waiver *is* the form.

¶ 56. While the top portion of the card does con-
tain blanks for the signer to supply his or her contact
information, such information would seem to be a
necessary part of the waiver itself, as if injury did occur,

it seems logical that the facility would be in need of the injured patron's contact information. The fact that the top portion of the card is entitled "GUEST REGISTRA-TION" does not somehow alter the inherent nature of the form. Indeed, one of the guidelines cited in *Yauger* is that the waiver should be separately labeled to distinguish it from other parts of the agreement. *Yauger,* 206 Wis. 2d at 87 n.2.

¶ 57. The majority also stresses that there is not a separate signature line for the waiver. Majority op., ¶ 23. However, the signature line on the form is located directly under the exculpatory language, unlike the waiver in *Richards,* 181 Wis. 2d at 1013. One has to wonder why there would need to be a separate signature line under the blank lines in the top portion of the form.

¶ 58. The exculpatory language in this case satis-fies the guidelines cited in *Yauger,* 206 Wis. 2d at 87 n.2. The waiver is conspicuous, as it is the only "paragraph" on the form. The waiver is set off from the remainder of the form in a separately titled section. The waiver is easy to locate. The waiver appears directly above a signature line and the waiver is the only portion of the document requiring a signature. The heading before the waiver is not misleading. The waiver itself is written in plain, easy to read language and does not contain an abundance of legal jargon. The waiver is written in large print. In other words, there is no doubt that the waiver is conspicuous and informs the signer of its nature and significance.

¶ 59. Yet, the majority concludes that the waiver "was not distinguishable enough." Majority op., ¶ 24. Apparently, the waiver would have been distinguishable if it appeared on a separate card, or if the form was multicolored and had but one more signature line, or if

Swimwest had not utilized capital letters when asking for contact information. *Id.,* ¶¶ 23–24. This type of analysis elevates form over substance and fails to consider the form on which the exculpatory clause appears as whole.

¶ 60. The majority states that it is clarifying the law in Wisconsin concerning exculpatory clauses. Majority op., ¶ 10. However, its application of these first two factors has done just the opposite. In *Yauger* we stated that a waiver appearing on a form with other language should be conspicuously labeled, set apart, and should stand out from the rest of the form. *Yauger,* 206 Wis. 2d at 87 & n.2. Here, this was done. Yet, the majority uses the very fact that the "Waiver Release Statement" is labeled separately from the "Guest Registration" portion to conclude that the form serves two purposes and thus does not provide adequate notice of the significance and nature of the waiver. Majority op., ¶ 23. In *Yauger,* we suggested that a waiver should be easy to read and should not be written in legalese. *Yauger,* 206 Wis. 2d at 87 & n.2. Yet, the majority faults Swimwest for not utilizing a legal term of art— "negligence"—in its waiver, and for not listing the precise act of negligence that allegedly occurred in this case. Majority op., ¶¶ 20, 22.

¶ 61. Further, as close reading of *Yauger* indicates, a document "serving two purposes" is not in and of itself questionable. Rather, the concern arises that the signer may not be aware of the nature and significance of the waiver when a document serves two purposes and the waiver is not conspicuous. *Yauger,* 206 Wis. 2d at 86–88. This concern is not present here because the waiver is conspicuous and, read in context, clearly indicates what is being waived. Thus, the fact

336

that the form on which it appears arguably serves two purposes should not be dispositive.

¶ 62. Finally, the majority concludes that the waiver is not valid because "there was no opportunity for Wilson to bargain over the exculpatory language[.]" Majority op., ¶ 25. This "bargaining" requirement originated in *Richards,* 181 Wis. 2d at 1019–20, and was not based on any existing case law. The "bargaining" requirement was not utilized in *Yauger.* The dissent in *Richards,* which I joined, indicated that this requirement was not based on existing law and discussed the inherent problems with such a requirement. *Richards,* 181 Wis. 2d at 1035–43 (Day, J., dissenting). In particular, the dissent in *Richards* queried:

> [W]hat does it mean to "negotiate" in this context, and how would [a] company ensure that the negotiations were "equal"? Are we to assess the competency of [the plaintiff] to negotiate and assume that any deficiencies must somehow be compensated for in substance by the company? . . . Or is it suggested that the company must appoint someone to help [the plaintiff] draft a counter-proposal? Must the company then negotiate—in good faith, of course—about which terms of its own release it might be willing to drop in "negotiations"? And what if, despite very skilled and fair negotiations on both sides, [the plaintiff] nevertheless agrees to accept the full release.

*Richards,* 181 Wis. 2d at 1041 (Day, J., dissenting).

¶ 63. It is entirely impractical to require "bargaining" in this context. Almost all releases are printed on standardized forms and are a condition precedent to the use of recreational facilities. Such releases are utilized by aquatic facilities, athletic clubs, ski resorts, canoeing and rafting outfits, and other high-risk ventures such as skydiving and bungee jumping. Many of these busi-

nesses are small firms whose continued existence is based on high customer volume. Must the owner of such business, or other person with the authority to negotiate, be present at the desk of such facility during all hours of operation? Must the proprietor employ a full-time attorney whose duties include negotiating with every person in the long line of skiers waiting to brave the slopes? These businesses would grind to a halt under such practices or, at the very least, face long lines of angry customers.

¶ 64. The reality is that there is almost never an opportunity to "bargain" over exculpatory clauses, as the majority describes it. Rarely do ordinary consumers in today's fast-paced global economy have an "opportunity" to bargain over any of the terms of a contract (other than perhaps the price), as the majority describes "bargaining." The only meaningful "bargaining" tool that an ordinary consumer possesses is his or her choice to frequent another business.

¶ 65. While *Richards* has not been overruled and I am bound to accept the lack of the "opportunity to bargain" as a legitimate factor in the analysis of exculpatory agreements, the use of the "bargaining" factor in this case is particularly troublesome in light of the majority's refusal to set forth a workable standard describing what would satisfy the "opportunity to bargain" requirement and its failure to decide whether a single objectionable factor is sufficient to render an exculpatory clause invalid. Majority op., ¶ 18 n. 7. *Richards,* which utilized the "bargaining" test, noted that no one factor alone was sufficient to invalidate an exculpatory agreement. *Richards,* 181 Wis. 2d at 1011. *Yauger,* which did not discuss the bargaining factor, came to the opposite conclusion and held the presence

of one factor was sufficient to invalidate an exculpatory clause. *Yauger,* 206 Wis. 2d at 87 n.1.

¶ 66.　The majority fails to resolve this dispute and leaves open the possibility that even an exculpatory clause that is expertly drafted, conspicuous, and appears on a separate document may be invalidated merely because the signer had no "opportunity to bargain." As such, the majority places the legitimacy of *all* exculpatory agreements in doubt. If this court wishes to invalidate all exculpatory clauses, then it should so hold, rather than burdening businesses with confusing requirements that are impossible or unlikely to be met in any case.

¶ 67.　Individuals have a right to know what the law is so that they may conduct their affairs in an orderly fashion. The majority has failed to articulate a clear, useable test that will provide meaningful guidance to those wishing to execute exculpatory agreements. Because the majority fails to articulate such a test, fails to apply the first two factors in accordance with the guidelines set forth in *Yauger,* and leaves open the possibility that the lack of an "opportunity to bargain" alone is sufficient to invalidate an exculpatory agreement, I respectfully dissent.