Peggy L. KELLAR, Plaintiff-Appellant,†

v.

John B. LLOYD, Sports Car Club of America, Incorporated, Chicago Region Sports Car Club of America, Incorporated, Elkhart Lake's Road America, Inc., Ralt Cars, Ltd., March Engineering, Ltd., Competition Preparation, Inc., Transamerica Insurance Company and Lloyd's Automotive, Inc., Defendants-Respondents,

UNUM LIFE INSURANCE COMPANY OF AMERICA and BCI HMO, Inc., Defendants.

Court of Appeals

*No. 92–2418. Submitted on briefs October 4, 1993.—Decided November 3, 1993.*

(Also reported in 509 N.W.2d 87.)

†Petition to review dismissed.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Paul J. Clymer* and *Paul Gagliardi* of *Gagliardi & Associates* of Salem.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Thomas J. Arenz* and *Pamela M. Schmidt* of *Frisch Dudek, Ltd.,* of Milwaukee.

On behalf of the defendant-respondent, Competition Preparation, Inc., the cause was submitted on the brief of *John R. Teetaert* and *Robert N. Duimstra* of *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.*, of Appleton.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J.   Peggy L. Kellar's personal injury action was dismissed by summary judgment based upon a standard form exculpatory contract that she signed before she was injured. She sets forth numerous arguments why the exculpatory contract should not bar her recovery against one or more defendants. We address her arguments separately. However, we primarily hold that the exculpatory contract contemplated Kellar's claims against the defendants and that enforcement of the exculpatory contract does not violate public policy. Also, we hold that Kellar has not alleged any facts showing, as a matter of law, that

the conduct of any of the defendants was reckless. We, therefore, affirm the trial court's dismissal of her cause of action.

Beginning in July 1986, Kellar, a member of the Sports Car Club of America (SCCA), participated as an unpaid volunteer worker at auto races. Before each race, Kellar signed a "release, waiver, and indemnity agreement" barring suit against SCCA, race participants and others for any injuries she might sustain from the releasees' negligence while she participated in the race events.

Kellar was injured on June 13, 1987, when a race car driver lost control of his car during a practice lap at Elkhart Lake's Road America race track. She was working as a member of a flagging and communications crew and, in that capacity, was required to stand close to the track. An inspection of the car after the accident revealed that the steering shaft had become uncoupled. Kellar signed a release form before this race, just as she had for other races occurring both before and after this accident.[1]

Kellar sued the race car driver and his "pit crew," the race track owner, the SCCA and another racing club (SCCA defendants) on various theories of negligence and/or recklessness. She also sued the race car manufacturer and its successor, and the distributor of the car (Race Car defendants) for strict products liability. The defendants sought summary judgment against Kellar, contending that the exculpatory contract barred recovery on her claims.

---

[1] The trial court found that Kellar had "signed at least 33 releases—seven prior to the accident and approximately twenty-six after the accident [after her release from the hospital while confined to a wheelchair [Kellar] was again participating in auto races and executing releases]."

The trial court granted summary judgment against Kellar, holding that the exculpatory agreement contemplated Kellar's claims against SCCA defendants and did not violate public policy. The court also held that "the agreement was intended as a general release without reservation, and as a consequence, the release applie[d] to the Race Car defendants. . . ." Further, the trial court held that Kellar did not allege any facts demonstrating reckless conduct of the defendants.

An appellate court must apply the standards set forth in sec. 802.08(2), Stats., when it reviews the grant of a summary judgment motion. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*; sec. 802.08(2).

"On motion for summary judgment, the burden is on the moving party to establish the absence of a genuine issue of material fact. Once the movant establishes a *prima facie* case for summary judgment . . . [t]o defeat the motion, the opposing party must set forth facts showing there is a genuine issue for trial." *Bantz v. Montgomery Estates, Inc.*, 163 Wis. 2d 973, 984, 473 N.W.2d 506, 510 (Ct. App. 1991) (citations omitted).

## I. EXCULPATORY CONTRACT

Kellar asserts that because the exculpatory agreement was deficient by its terms and circumstances, it cannot bar her claims against the defendants. Addi-

tionally, Kellar argues that the agreement is void as against public policy.

## A. Contemplation of the Parties

Kellar argues that the exculpatory contract is not enforceable against the SCCA defendants, as a matter of law, because she did not contemplate the actual danger and risk of injury presented by inadequate worker protection. She apparently contends that a valid exculpatory contract would have specified the location and particular conditions of the station where she was working and the specific kind of accident which caused her injury. Kellar also contends that the contract is ambiguous because its language does not clearly cover negligent disassembly, reassembly and inspection of the race car's steering mechanism by pit crew members—acts taking place at a time which are remote from the event and, thus, not within contemplation of the parties. We hold that the circumstances of Kellar's accident were reasonably within the contemplation of the parties when the exculpatory agreement was signed.

"Exculpatory agreements that are broad and general in terms will bar only those claims that are within the contemplation of the parties when the contract was executed." *Arnold v. Shawano County Agric. Soc'y*, 111 Wis. 2d 203, 211, 330 N.W.2d 773, 778 (1983), *overruled on other grounds*, *Green Spring Farms*, 136 Wis. 2d at 317, 401 N.W.2d at 821. Courts construe such agreements strictly against the party seeking to rely on them. *Arnold*, 111 Wis. 2d at 209, 330 N.W.2d at 777. Where the facts are undisputed, the scope of a release and the intention of the parties that the release shall

171

cover particular claims are for the court to decide. *See id.* at 212, 330 N.W.2d at 778.

Our supreme court has addressed the adequacies of a standard form exculpatory contract in a sports car racing situation. In *Arnold,* while participating in a stock car race, the plaintiff was injured outside the "restricted area" because of negligent rescue squad operations. *Id.* at 204-05, 214, 330 N.W.2d at 774, 779. To participate in the race, the plaintiff signed an exculpatory contract barring his claim for negligence against the defendants. The trial court granted summary judgment dismissing the plaintiff's cause of action. Our supreme court held that summary judgment was improper because the contract contained "broad and general provisions" and there was an issue of material fact "as to whether the risk of negligent rescue operations was within the contemplation of the parties at the time the exculpatory contract was executed." *Id.* at 211-12, 330 N.W.2d at 778. Additionally, the agreement by its terms was limited to injuries sustained within the restricted area. The court stated there was a possible issue of material fact as to whether injuries occurring outside the restricted area were within the contemplation of the parties to the agreement. However, the court stated in dicta that "it would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant. . . ." *Id.* at 212, 330 N.W.2d at 778.

The undisputed facts in this case are as follows. Kellar, during her deposition, acknowledged that she knew the purpose for signing the release was to bar her from suing for any injury sustained while participating in the race. Kellar had been at Road America five to

seven times before the weekend of her accident. She had had ample opportunity to assess whether the track was a safe place to participate as a flagging and communications worker and, according to her deposition testimony, had decided that it was a safe place to work. Kellar testified at her deposition that she knew that if a race car left the track at a high speed that a person close to the track could be killed. During the first year before her injury, Kellar witnessed at least one accident per race weekend that she worked. She had served as a corner worker in about nine races.

As in *Arnold*, we examine a contract with terms that could be considered broad and general. However, in the present case and unlike the contract in *Arnold*, Kellar by her signature acknowledged and agreed that "the activities are very dangerous and involve the risk of serious injury and/or property damage. . . ." *Compare Arnold*, 111 Wis. 2d at 206, 330 N.W.2d at 774-75. The agreement specifically released "the Sports Car Club of America, Inc. . . . officials, car owners, drivers, pit crews . . . racing associations . . . owners and lessees of PREMISES. . ." from claims or demands for harm caused to Kellar while she was "in or upon the RESTRICTED AREA, and . . . working in [June Sprints]. . . ." Unlike the *Arnold* circumstances, Kellar was in a restricted area when she was injured.

Before each race event, Kellar was required to sign a new contract. The contract had, at the top of the form, the name and date of the event. Kellar noted on the same line as her signature her status as a flagging and communications worker. Thus, the exculpatory agreement specified the location, date and type of activity.

■
We hold that the undisputed facts, as derived from Kellar's deposition and the terms of the contract, show

that the possibility of an accident similar to the one which caused Kellar's injuries was within the contemplation of the parties to the contract when they signed the contract. Furthermore, the release provided that Kellar was relying on her own inspection and judgment and not on any safety precautions taken by other event participants or sponsors.

Kellar also argues that she should not be barred from recovery because she did not read the exculpatory agreement before signing it. However, as the trial court stated, "a contracting party, not otherwise disabled, is bound by the law to know and understand the terms of the document he or she signs." *See Martinson v. North Central Life Ins. Co.*, 65 Wis. 2d 268, 278, 222 N.W.2d 611, 616 (1974). The release was signed by Kellar two days before the event. She does not claim that she was unable to read the agreement before signing it. For this reason, her argument fails.

## B.   Misrepresentation

Next, Kellar argues that the SCCA by statements in its "Flagging and Communications Manual" misrepresented the purpose of the exculpatory contract as "to discourage suit."[2] She contends she was consequently

---

[2] The SCCA states in its "Flagging and Communications Manual": "The signing of the . . . release form entitles workers to receive all the benefits of the SCCA's Master Insurance Program if they are injured in any way while on duty at the event, but discourages them from suing the SCCA or the Region conducting the event for compensation over and above that provided by SCCA insurance." The SCCA defendants contend that the parol evidence rule prohibits Kellar's reliance on the SCCA manual. Although the SCCA manual is not actually part

174

misled because the contract did not merely discourage her from suing, but it instead barred her recovery from the defendants.[3] We hold that the statement in the SCCA manual is not a misrepresentation.

In *Merten v. Nathan*, 108 Wis. 2d 205, 321 N.W.2d 173 (1982), our supreme court held that it is "contrary to public policy to enforce an exculpatory contract when the bargaining process involves a mistake or deception which is relevant to a reasonable person's decision to execute a release allocating losses." *Id.* at 215, 321 N.W.2d at 178.

Here, the statement was not a misrepresentation because Kellar was not barred from suing or from recovery in all circumstances. She was barred from recovering for injuries caused by the negligence of the defendants, but she was not precluded from suing for injuries caused by, for instance, intentional acts. Furthermore, Kellar has not shown that the statement was relevant to her decision; she has not shown that she read or relied upon the statement before signing the contract.

Kellar also argues that the exculpatory contract itself contains a misrepresentation because it does not "affirmatively state that [the contract] will be asserted to bar any suit for damages." However, the agreement contained three separate provisions: (1) a release, waiver and covenant not to sue, (2) an indemnity agreement, and (3) an express assumption of risk. We hold

of the contract, the parol evidence rule does not exclude evidence to show misrepresentation as a ground for avoidance of the contract. *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 731, 456 N.W.2d 585, 588 (1990).

[3] She argues that the word "discourage" is not the same as the word "prohibit."

that Kellar was bound to understand the legal effect of the provisions of the document she signed. *See Martinson*, 65 Wis. 2d at 278, 222 N.W.2d at 616.

## C. General Release

Kellar contends that the exculpatory contract is not effective against the Race Car defendants because they were not named expressly or functionally in the contract. She argues that this prospective exculpatory contract is the same as a covenant not to sue the SCCA defendants and, as such, cannot act as a general release discharging her claim against other joint tortfeasors. We hold that the exculpatory contract was intended as a general release without reservation and, consequently, applied to the Race Car defendants.

We determine the effect of a release according to the intent of the parties to the release, not by the form of the instrument alone or by the mere use of the word "release" in the document. *See Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 233-34, 276 N.W.2d 709, 713 (1979). Where the facts are undisputed, the intent of the parties to a release and the correlative scope of the release are questions of law, which this court reviews *de novo. See Arnold*, 111 Wis. 2d at 212, 330 N.W.2d at 778. However, we follow the well-reasoned analysis of the trial court on this issue.

Our supreme court stated in *Brown*:

> Where it is found that the agreement is intended to be a true general release of all claims with no express reservation of any cause of action against other wrongdoers, the fact that the release is restricted to named individuals is immaterial. It is general as to those individuals and therefore . . . is

176

sufficient to release joint tortfeasors because the liability of the named individuals includes the damages attributable to the joint tortfeasors.

*Brown*, 88 Wis. 2d at 235, 276 N.W.2d at 714.

Here, we hold that *Brown* controls on this issue and we consequently agree with the trial court that the language of the release coupled with Kellar's understandings about the release compel the conclusion that "the agreement was intended to be a true general release of all claims." As the trial court stated, "Kellar realized that the purpose of the release was to prevent her from suing anyone if she was to become injured during her participation in the Road America June Sprints in 1987." Furthermore, the exculpatory contract did not contain an express reservation of "any cause of action against other wrongdoers." *See id.*

### D.   Public Policy

Kellar makes public policy arguments against enforcement of the exculpatory contract and cites *Dobratz v. Thomson*, 161 Wis. 2d 502, 468 N.W.2d 654 (1991), as supporting her arguments.

#### 1.   Common Law Employee

First, she contends that exculpatory contracts are unenforceable on grounds of public policy if the contract "exempts an employer from liability to an employee for injury in the course of his employment." *Id.* at 516, 468 N.W.2d at 659 (citing RESTATEMENT (SECOND) OF CONTRACTS § 195 (1979)). She argues that she is a common law employee and cites two early Wisconsin

cases which are not dispositive here.[4] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 743 (1976) defines employee: "any worker who is under wages or salary to an employer. . . ." The record does not show that Kellar received any wages or monetary gain through her status as a flagging and communications worker. At her deposition, Kellar acknowledged that she did not participate in the races professionally or to earn a living. We hold that Kellar has not shown that she was a common law employee of the defendants.

## 2. Safe Place Statute

Kellar argues that she was protected under the safe place statute, sec. 101.11, Stats., as an employee or a frequenter and, consequently, the exculpatory contract cannot bar her claim on public policy grounds. Apparently, her argument is that she is a member of one class which is protected against harm by the negligent conduct of a different class of which the SCCA defendants are a part. *See* RESTATEMENT (SECOND) OF

---

[4] Kellar cites *Wagner v. Plano Mfg. Co.*, 110 Wis. 48, 85 N.W. 643 (1901), which held that an employer owed to an unpaid worker the same duty to warn of risks of injury as it did to an employee. *Id.* at 51, 85 N.W. at 644. She also cites *Johnson v. Ashland Water Co.*, 77 Wis. 51, 45 N.W. 807 (1890), which held that the plaintiff, an unpaid worker, was entitled to the same protection as any other servant of the company, "unless the circumstances show that the plaintiff assumed the risks incident to doing the work. . . ." *Id.* at 53, 45 N.W. at 808. In both cases, our supreme court held that the employer did not have a duty to warn because the risk of danger was obvious. *Wagner*, 110 Wis. at 51, 85 N.W. at 644; *Johnson*, 77 Wis. at 54, 45 N.W. at 808. These cases do not address the ability of an employer to limit its liability.

CONTRACTS § 195(2)(c) (1979).[5] We hold that the safe place statute does not protect Kellar either as an employee or a frequenter.

Section 101.01(2)(a), Stats., defines employee as "every person who may be required or directed by any employer, in consideration of direct or indirect gain or profit, to engage in any employment. . . ." Kellar asks us to apply the rule that a qualifying clause in a statute is to be referred to the next preceding antecedent.[6] *See Jorgenson v. City of Superior*, 111 Wis. 561, 566, 87 N.W. 565, 567 (1901), *overruled on other grounds, Dahlman v. City of Milwaukee*, 131 Wis. 427, 110 N.W. 479 (1907). Accordingly, she argues that the phrase "in consideration of direct or indirect gain or profit" qualifies only to the word "employer," and therefore, it is not necessary that the employee work for profit or gain, only that the employer work for profit or gain. However, this phrase only provides logical meaning if it modifies the entire antecedent phrase, "every person who may be required or directed by any employer." The

---

[5] RESTATEMENT (SECOND) OF CONTRACTS § 195(2)(c) (1979) provides:

> A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if . . . the other party is similarly a member of a class protected against the class to which the first party belongs.

[6] Kellar also argues that when the legislature enacted the safe place statute, it intended to supplement, not supplant, the common law remedies available to employees. However, we are not faced here with a determination about available remedies. We are asked to determine the meaning of the term "employee." Where the language of a statute is unambiguous, we need not look beyond the statute's language to determine legislative intent. *See In re Jamie L.*, 172 Wis. 2d 218, 225, 493 N.W.2d 56, 59 (1992).

use of the words "in consideration" denotes an exchange of one thing for another. In other words, a person is an "employee" if, in exchange for submitting to the employer's power or authority to direct the employee, the employer provides indirect gain or profit to the employee. The following absurdity results from the construction requested by Kellar: a person is an "employee" if in exchange for submitting to the employer's authority to direct the employee, indirect gain or profit goes to the employer. Under this latter construction, there would be no exchange.

Kellar does not claim that she received wages and she does not argue that she received indirect or direct gain or profit.[7] We hold that Kellar was not entitled to protection as an employee under the safe place statute.

Kellar alternatively argues in her brief-in-chief that she was a frequenter, but does not discuss the nature of the duty owed to frequenters under the statute. The statute imposes liability on employers for unsafe conditions of the employer's premises causing harm to frequenters and not with negligent or inadvertent acts of employees or activities conducted on the premises. *Leitner v. Milwaukee County*, 94 Wis. 2d 186, 195, 287 N.W.2d 803, 807 (1980). In the portion of her reply brief pertaining to this issue, Kellar apparently contends that an inadequate guardrail was an

---

[7] Kellar states that to defeat her claim, the defendants must show "that she was not qualified to receive any of the following: free admission for herself, free admission to the race for one or more guests, any free lunch to be supplied to workers, and drinks and food supplied at a worker appreciation party held at the track." Kellar provides no citations to the record and does not develop any legal arguments that any of these activities would constitute gain or profit under the safe place statute.

180

unsafe condition under the safe place statute, but does not develop an argument or present appropriate authority to support this contention. Because Kellar's argument on this necessary element was inadequately briefed, we decline any further review of this issue. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633, 642 (Ct. App. 1992).

### 3.  *Strict Products Liability*

Kellar argues that the Race Car defendants were strictly liable because they designed, manufactured, distributed and sold the steering mechanism in a defective condition such that it was unreasonably dangerous.[8] Public policy prohibits enforcement of a term of an exculpatory contract which exempts from liability a seller of a product. *See Dobratz*, 161 Wis. 2d at 516, 468 N.W.2d at 659. However, courts may enforce a term fairly bargained for and consistent with the policy underlying that liability.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 195(3). We hold that the terms exempting the Race Car defendants from liability were fairly bargained for and consistent with public policy.

A determination as to whether an exculpatory contract is void as contrary to public policy involves accommodating the tension between principles of contract law and tort law. *Dobratz*, 161 Wis. 2d at 514-15, 468 N.W.2d at 658. The law of contracts protects the justifiable expectations of individuals who choose to

---

[8] By order of the court of appeals on February 11, 1993, this appeal will be decided without the benefit of briefs from respondents, Ralt Cars, Ltd. and March Engineering, Ltd., because of delinquent briefs.

enter into agreements. *Merten*, 108 Wis. 2d at 211, 321 N.W.2d at 177. Tort law compensates individuals injured by the unreasonable conduct of others. *Id.* Where the unreasonable conduct, even though dangerous, is within the contemplation of the parties to an agreement, the agreement is not necessarily void as against public policy. We must examine the particular facts and circumstances in order to determine if public policy precludes enforcement of a contract. *See Dobratz*, 161 Wis. 2d at 514, 468 N.W.2d at 658.

As the United States District Court for the Eastern District of Wisconsin noted: "The risks and hazards of racing are well known. They are a source of the sport's appeal both to racers and spectators. The risks and hazards are consciously borne to attain some other certain benefits, both tangible and intangible." *Hammer v. Road America, Inc.*, 614 F. Supp. 467, 469 (E.D. Wis. 1985) (enforcing an exculpatory agreement executed between a motorcycle racer and the American Motorcycle Association), *aff'd*, 793 F.2d 1296 (7th Cir. 1986).

We find the reasoning of *Hammer* applicable in the present case. The risks and hazards of racing were consciously borne by Kellar in exchange for a benefit. At her deposition, Kellar conceded that she participated in the races for fun, excitement and recreation. She acknowledged that she had witnessed an accident during each weekend that she worked. In the release, she acknowledged that racing was a dangerous sport.

Racing accidents occur for a variety of reasons—driver error, mechanical failure and condition and configuration of the track—to name a few. Even though Kellar may not have contemplated all of the possible causes of racing accidents in exchange for the opportunity to participate in the races, Kellar released the defendants from liability for negligence. As

explained by the *Hammer* court, the risks and hazards of racing are part of the appeal of the sport. Although the Race Car defendants are not specifically named in the exculpatory contract, the contract, as a general release of all defendants, was fairly bargained for.

## II.  RECKLESSNESS

First, Kellar argues, even if the exculpatory contract is otherwise valid, it should not be enforced because the defendants' actions were reckless.[9] Wisconsin cases have acknowledged that an exculpatory contract exempting a party from tort liability for harm caused intentionally or recklessly is void as against public policy. *See, e.g., Merten*, 108 Wis. 2d at 212-13, 321 N.W.2d at 177-78. However, we hold, as a matter of

---

[9] By order dated March 25, 1993, we withdrew this case from submission pending the decision of the Wisconsin Supreme Court in *Lestina v. West Bend Mut. Ins. Co.*, 176 Wis. 2d 901, 501 N.W.2d 28 (1993). We did this because of the possibility that a subsequent opinion in *Lestina* might give us guidance on the public policy issues presented here. After *Lestina* was decided, we granted the appellant's request to submit a supplemental brief to address the application of *Lestina* to this appeal.

In *Lestina*, the court addressed the issue: "[I]s negligence the standard governing the conduct of participants in recreational team contact sports?" *Id.* at 905, 501 N.W.2d at 29-30. The court held that the negligence standard, when properly applied, can accomplish the same objective sought by courts applying the recklessness standard, to avoid chilling the vigorous and active participation in sporting events. *Id.* at 910-12, 501 N.W.2d at 32-33. However, we hold that no part of the *Lestina* opinion is helpful in deciding the public policy issues in this case.

law, that Kellar does not allege facts showing that any of the defendants' conduct was reckless.

■

"[W]hether the facts fulfill a particular legal standard is a question of law." *Nottelson v. DILHR*, 94 Wis. 2d 106, 116, 287 N.W.2d 763, 768 (1980). Accordingly, whether any of the defendants' conduct fulfills a recklessness standard is a question of law. As a question of law, we review this issue *de novo. See First Nat'l Leasing Corp. v. City of Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977).

As defined by the Wisconsin legislature, criminal recklessness means that "the actor creates an unreasonable and substantial risk of death or great bodily harm to another human being and the actor is aware of that risk." Section 939.24, Stats. In *Lestina v. West Bend Mut. Ins. Co.*, 176 Wis. 2d 901, 501 N.W.2d 28 (1993), our supreme court cited, without adopting, the recklessness standard defined in RESTATEMENT (SECOND) OF TORTS § 500 (1965):

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable [person] to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also such risk is substantially greater than that which is necessary to make his conduct negligent.

*Lestina*, 176 Wis. 2d at 907 n.5, 501 N.W.2d at 31.

■

Thus, "recklessness" contemplates a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another.

Kellar alleged "reckless conduct causing her injury including reckless reassembly of steering linkage, reckless failure to inspect and discover the defectively assembled steering linkage, reckless design of worker safety and protection structures, reckless location of the flagging station in a place not reasonably suited for workers' protection, and reckless failure to warn the plaintiff that the worker protection structure was inadequate." Although Kellar raised these factual issues, she does not allege any facts showing that the defendants consciously disregarded any risk of harm to her. For instance, although she alleged reckless design of worker protection structures, she has not alleged that any of the defendants knew or had reason to know of an unreasonable risk of harm to her or other flagging and communications workers because of the design of the structure at the station where she was injured. She has also not alleged that anyone knew or had reason to know of any defects in the car. Kellar acknowledged at her deposition that no one involved did anything purposefully to hurt her.

Kellar also argues that the defendants were not entitled to summary judgment because genuine issues of material fact about the defendants' conduct were created when the defendants denied her allegations of reckless conduct. Because we hold, as a matter of law, that none of the alleged facts shows recklessness, we also hold that any issues of fact raised are not material.

## CONCLUSION

We are satisfied that the defendants established a *prima facie* defense to Kellar's action. The depositions and affidavits on record show that Kellar, knowing the condition of the track from her own inspection and

185

knowing the dangers of racing from her previous experience and from the terms of the exculpatory contract, signed releases absolving the defendants from any and all liability for injuries occurring as a result of her participation in the June Sprints. *See Trainor v. Aztalan Cycle Club, Inc.*, 147 Wis. 2d 107, 111, 432 N.W.2d 626, 628 (Ct. App. 1988). We also hold that Kellar did not set forth facts showing that there is a genuine issue of material fact and we hold that the defendants were entitled to judgment as a matter of law. Accordingly, the trial court's dismissal of Kellar's action is affirmed.

*By the Court.*—Judgment affirmed.