COURT OF APPEALS
DECISION
DATED AND FILED

February 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP410**

STATE OF WISCONSIN

Cir. Ct. No. 2019CV9

IN COURT OF APPEALS
DISTRICT III

BRETT K. BECKER AND ZACHARY G. HINTZE,

    PLAINTIFFS-APPELLANTS,

  V.

NOVA CASUALTY COMPANY AND GRANITE PEAK CORPORATION,

    DEFENDANTS-RESPONDENTS,

BLUE CROSS BLUE SHIELD OF ILLINOIS AND UNITED HEALTHCARE
INS. CO.,

    SUBROGATED DEFENDANTS.

        APPEAL from an order of the circuit court for Marathon County: MICHAEL K. MORAN, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Brett K. Becker and Zachary G. Hintze appeal an order granting summary judgment to Nova Casualty Company and Granite Peak Corporation.[1] Becker and Hintze were injured while traversing a ski jump at Granite Peak's ski hill. Although they each signed an exculpatory agreement before skiing, they argue that the agreement is unenforceable on public policy grounds. They also argue that the exculpatory agreement does not bar their claims against Granite Peak because there is a genuine issue of material fact as to whether Granite Peak acted recklessly, as opposed to merely negligently. We reject Becker and Hintze's arguments and affirm.

## BACKGROUND

¶2 On January 4, 2016, Becker and Hintze were seriously injured on a ski jump called "Sky High" at a ski hill owned by Granite Peak. At the time of the accidents, both Becker and Hintze were nineteen years old, were enrolled in college, and were experienced skiers.

¶3 On the day of the accidents, Becker was injured first, at about 2:15 p.m. Following Becker's accident, the Sky High jump was closed for a time but was later reopened. Hintze's accident then occurred at approximately 5:10 p.m. Following Hintze's accident, Granite Peak shut down and redesigned

---

[1] Throughout the remainder of this opinion, we refer to Granite Peak Corporation, individually, as "Granite Peak." We also refer to Granite Peak and its insurer, Nova Casualty Company, collectively as "Granite Peak" when discussing arguments made or actions taken by them in the underlying litigation and on appeal.

the jump, doubling the length of the "deck"—that is, the beginning of the landing area—from fifteen feet to thirty feet.

¶4 Prior to entering the ski area on the day of the accidents, Becker and Hintze each signed a document entitled "Granite Peak Lift Ticket Release of Liability & Parent Agreement 2015-2016" (hereinafter, "the Release"). We discuss the Release's terms in detail below. Becker and Hintze were each offered the opportunity to avoid signing the Release by paying an additional fifteen dollars, above the normal lift ticket price. Neither of them exercised that option.

¶5 Becker and Hintze filed suit against Granite Peak in January 2019, asserting claims for ordinary negligence; for negligent hiring, training, supervision, and/or retention; and for violating the Safe Place Statute, WIS. STAT. § 101.11 (2021-22).[2] Their complaint also sought punitive damages.

¶6 Becker and Hintze ultimately filed a motion for declaratory judgment, asking the circuit court to declare that the Release was unenforceable as against public policy. Following briefing, the court denied the motion, concluding that the Release was enforceable under the two-step test set forth in *Roberts v. T.H.E. Insurance Co.*, 2016 WI 20, 367 Wis. 2d 386, 879 N.W.2d 492. The court also cited *Schabelski v. Nova Casualty Co.*, 2022 WI App 41, 404 Wis. 2d 217, 978 N.W.2d 530, noting that in that case, the court of appeals upheld an exculpatory agreement that was "nearly identical" to the Release.

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶7     After the circuit court denied Becker and Hintze's motion for declaratory judgment, Granite Peak moved for summary judgment, arguing that the Release was enforceable and barred all of Becker and Hintze's claims. In its summary judgment brief, Granite Peak acknowledged that an exculpatory contract "cannot release reckless or intentional acts." Granite Peak asserted, however, that Becker and Hintze's complaint did not allege any reckless or intentional conduct.

¶8     In opposition to Granite Peak's summary judgment motion, Becker and Hintze again argued that the Release was unenforceable. In addition, Becker and Hintze argued that the circuit court should deny Granite Peak's summary judgment motion because "liability waivers do not apply to recklessness and a jury could reasonably find that Granite Peak acted recklessly under the facts." (Formatting altered.)

¶9     The circuit court issued a written decision granting Granite Peak's summary judgment motion. At the outset, the court stated that it was not "revisiting the validity or enforceability of" the Release, as that issue had "already been decided." Accordingly, the court stated that the only remaining question was whether Granite Peak had acted recklessly, as liability for recklessness cannot "be avoided by an exculpatory contract." The court then concluded that Becker and Hintze's recklessness argument was not supported by the evidence they had submitted. In particular, the court concluded that Becker and Hintze's "proof does not support the conclusion that Granite Peak consciously disregarded an unreasonable and substantial risk of serious bodily harm to another."

¶10     Consequently, the circuit court determined that the Release barred all of Becker and Hintze's claims against Granite Peak, and the court therefore granted Granite Peak's motion for summary judgment. The court subsequently

entered an order dismissing all of Becker and Hintze's claims, and this appeal follows.

## DISCUSSION

¶11    We independently review a grant of summary judgment, using the same methodology as the circuit court. *Hardy v. Hoefferle*, 2007 WI App 264, ¶6, 306 Wis. 2d 513, 743 N.W.2d 843.  Summary judgment is appropriate where "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law."  WIS. STAT. § 802.08(2).   When reviewing a circuit court's summary judgment ruling, we construe the facts and all reasonable inferences from those facts in favor of the nonmoving party. *Strozinsky v. School Dist. of Brown Deer*, 2000 WI 97, ¶32, 237 Wis. 2d 19, 614 N.W.2d 443.

¶12    In this case, our review of the circuit court's summary judgment ruling also requires us to determine whether the Release is valid and enforceable. "The validity of an exculpatory contract is reviewed as a matter of law." *Roberts*, 367 Wis. 2d 386, ¶22.

## I. Enforceability of the Release

¶13    "Wisconsin law does not favor exculpatory releases because 'they tend to allow conduct below the acceptable standard of care applicable to the activity.'" *Schabelski*, 404 Wis. 2d 217, ¶27 (citation omitted).  Consequently, we "construe such releases strictly against those who seek to rely on them." *Id.*

¶14    In *Roberts*, our supreme court identified a two-step process for determining whether a release is enforceable.  *See Schabelski*, 404 Wis. 2d 217, ¶28 (citing *Roberts*, 367 Wis. 2d 386, ¶49).  First, we must examine the facts and

circumstances surrounding the release to determine whether the release covers the activity at issue. *Id.* "If the activity is not covered by the release, then the release 'should be determined to be unenforceable in regard to such activity.'" *Id.* (citation omitted). "If the release does cover the activity in question, then we proceed to the second step of determining whether the release is enforceable under public policy." *Id.*

¶15 Here, Becker and Hintze do not dispute that the release covers the activity in question—that is, their use of ski jumps at Granite Peak. We therefore turn to the second step of the *Roberts* analysis—i.e., whether the release is enforceable under public policy. "Public policy refers to the 'principle of law under which freedom of contract or private dealings is restricted by law for the good of the community.'" *Schabelski*, 404 Wis. 2d 217, ¶29 (citation omitted). When performing a public policy analysis, we must attempt "to balance the tension between contract law, which seeks to protect the ability to 'manage [one's] own affairs without government interference,' and tort law, which seeks to deter conduct below the standard of care and compensate persons injured by the unreasonable conduct of others." *Id.* (alteration in original; citation omitted).

¶16 Wisconsin courts have identified various principles that are relevant to determining whether a release is enforceable under public policy. For instance, the release "must clearly, unambiguously, and unmistakably inform the signer of what is being waived" and "must alert the signer to the nature and significance of what is being signed." *Yauger v. Skiing Enters., Inc.*, 206 Wis. 2d 76, 84, 557 N.W.2d 60 (1996). Related to these factors, our supreme court has considered whether an exculpatory agreement "is overly broad and all-inclusive"; whether the agreement "serv[es] two functions" and does not require "a separate signature for the exculpatory clause, thus not sufficiently highlighting that clause"; and whether

the signer had an "opportunity to bargain or negotiate in regard to the exculpatory language in question." *Atkins v. Swimwest Fam. Fitness Ctr.*, 2005 WI 4, ¶18, 277 Wis. 2d 303, 691 N.W.2d 334; *see also* *Richards v. Richards*, 181 Wis. 2d 1007, 1017-20, 513 N.W.2d 118 (1994).

¶17     We begin our analysis by setting forth the material terms of the Release. The Release is a single-page document bearing the title "**GRANITE PEAK LIFT TICKET RELEASE OF LIABILITY & PARENT AGREEMENT 2015-2016**" in capital letters and bold type at the top of the page. Immediately below the title, the Release states in capital letters and bold type: "**PLEASE READ CAREFULLY BEFORE SIGNING. THIS IS A RELEASE OF LIABILITY AND WAIVER OF CERTAIN LEGAL RIGHTS.**" Underneath that admonition, the Release states:

> I understand that skiing in its various forms, including snowboarding, involves risks, dangers, and hazards that may cause serious personal injury or death and that injuries are a common and ordinary occurrence. Risks include, but are not limited to, changes in terrain, weather and snow surfaces, ice, moguls, bare spots, rocks, stumps, debris, fences, posts, trees, lift equipment and towers, the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs, light poles, signs, buildings, ramps, roads and walkways, terrain features, including rails, boxes, corrugated pipes, cylinders, dance floors, wall rides, rollers, and table tops and other jumps, including their height, the location of the start point, and the angle of their approaches and the angle and length of their take-off ramps and landing areas, and other terrain features, padded and non-padded obstacles, snowmaking, grooming, and snowmobile equipment and operations, and collisions with other persons and other natural and man-made hazards, including collisions with people and obstacles adjacent to and off the skiable terrain, such as snowmaking pipes, hydrants, guns, wands, and other snowmaking equipment, rocks and trees, and improperly-adjusted and malfunctioning equipment. I acknowledge the risks in the sport of skiing can be greatly reduced by taking lessons, abiding by the Skier

7

Responsibility Code (known as Your Responsibility Code), obeying the Wisconsin Skier Safety Act, and using common sense.

¶18 The next paragraph of the Release addresses the signer's release of Granite Peak from liability for personal injury caused by Granite Peak's negligence with respect to particular activities. Specifically, the Release states:

In consideration of the purchase of a lift ticket for Granite Peak and use of its facilities, **I RELEASE AND FULLY DISCHARGE Granite Peak Corporation, its owners, officers, shareholders, agents, and employees (collectively the "GRANITE PEAK RELEASEES") from any liability resulting from any personal injury to myself, including death, which is caused by any NEGLIGENT ACT OR OMISSION of any GRANITE PEAK RELEASEE with respect to:**

- the design, location, construction, inspection, and maintenance of trails, ski runs, and slopes, including their grooming and modifications to their natural steepness and pitches;

- the design, location, construction, inspection, and maintenance of rails, boxes, tube jams, table tops, step-up and step-down jumps, and other jumps, including their height, their start location, the angle of their approaches and the angle and length of their take-off ramps and landing areas;

- grooming, snowmaking, and snowmobile equipment and operations;

- the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs;

- the padding or non-padding of natural and man-made obstacles and hazards on, adjacent to, or off the skiable terrain;

- the posting or failure to post warnings, signs, and the construction of fences or other barriers, including the selection of the construction materials, or the failure to construct fences or other barriers;

- the classification and labeling of trails, ski runs, and terrain features; and

- the presence of snowmaking pipes, hydrants, guns, wands, other snowmaking equipment, light posts, rocks, and trees adjacent to the ski runs.

I accept full responsibility for any personal injury which may result from my participation in the sport, and I hereby **HOLD HARMLESS** the GRANITE PEAK RELEASEES for any personal injury sustained by me, including death, caused by the negligence of any GRANITE PEAK RELEASEE while participating in the sport. **I agree not to bring any action or lawsuit against any GRANITE PEAK RELEASEE for any personal injury caused by the NEGLIGENCE of any GRANITE PEAK RELEASEE.**

¶19 The Release then clarifies that, in accordance with Wisconsin law, "nothing in this Release should be construed as releasing, discharging, or waiving any claims I may have for reckless or intentional acts on the part of any GRANITE PEAK RELEASEE." The Release further provides:

I understand that for a fee of $15.00 per person per day in addition to the normal lift ticket price, Granite Peak offers an optional lift ticket that does not require me to sign a Release of Liability. In signing this Release of Liability, I acknowledge I am aware of this option offered by Granite Peak and hereby waive my right to purchase the same.

¶20 Finally, immediately above the signature lines, the Release states in capital letters and bold type:

**I HAVE CAREFULLY READ THIS LIFT TICKET RELEASE OF LIABILITY AND UNDERSTAND ITS CONTENTS. I AM AWARE THAT BY SIGNING THIS RELEASE OF LIABILITY, I AM WAIVING CERTAIN LEGAL RIGHTS, INCLUDING THE RIGHT TO SUE GRANITE PEAK CORPORATION, ITS OWNERS, OFFICERS, SHAREHOLDERS, AGENTS OR EMPLOYEES FOR CERTAIN CLAIMS.**

**CAUTION: READ BEFORE SIGNING!**

**THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS AND WILL BAR YOUR RIGHT TO SUE!**

¶21 When considered in its entirety, the Release clearly and unambiguously informed Becker and Hintze of what was being waived and alerted them to the significance of what was being signed. *See Yauger*, 206 Wis. 2d at 84. As an initial matter, the Release repeatedly informed Becker and Hintze that it was a release of liability. It expressly directed them—in two places, and in capital letters and bold type—to read the document before signing.

¶22 Furthermore, the Release informed Becker and Hintze that skiing involves risks, dangers, and hazards that may cause personal injury. It then listed a number of specific risks and stated that Becker and Hintze "acknowledge[d]" that those risks could be reduced by taking certain actions.

¶23 Next, the Release stated, in bold type, that Becker and Hintze released Granite Peak from liability for personal injury caused by "any negligent act or omission" of Granite Peak with respect to specific activities listed in eight separate bullet points. One of those bullet points specifically referred to "the design, location, construction, inspection, and maintenance of … step-down jumps, and other jumps, including their height, their start location, the angle of their approaches and the angle and length of their take-off ramps and landing areas."[3] After listing those specific activities, the Release stated, in bold type, that Becker and Hintze agreed not to bring any action or lawsuit against Granite Peak for any personal injury caused by its negligence. The Release then specifically

---

[3] The circuit court determined that the Sky High jump was a step-down jump, and Becker and Hintze do not argue otherwise on appeal.

clarified that Becker and Hintze were not releasing any claims against Granite Peak based on its intentional or reckless conduct.

¶24    Finally, the Release stated, in capital letters and bold type, that Becker and Hintze had read the Release and were aware that, by signing it, they were "waiving certain legal rights, including the right to sue Granite Peak … for certain claims." (Formatting altered.) Immediately before the signature lines, the Release stated: "**<u>THIS DOCUMENT AFFECTS YOUR LEGAL RIGHTS AND WILL BAR YOUR RIGHT TO SUE!</u>**"

¶25    These provisions clearly and unambiguously informed Becker and Hintze that they were waiving their right to sue Granite Peak to recover for personal injuries caused by Granite Peak's negligence with respect to certain, enumerated activities, including Granite Peak's design, location, construction, inspection, and maintenance of step-down jumps. The Release also alerted Becker and Hintze to the significance of what was being signed by using capital letters and bold type to emphasize important provisions, by repeatedly stating that the document was a release of liability and affected their legal rights, and by twice cautioning Becker and Hintze to read the document before signing it.

¶26    Moreover, we note that the Release served a single function—that is, releasing Granite Peak from liability for personal injuries resulting from Granite Peak's negligence related to certain, enumerated activities. Unlike the exculpatory contract in *Atkins*, the Release did not "serv[e] two functions" without requiring "a separate signature for the exculpatory clause." *See Atkins*, 277 Wis. 2d 303, ¶18.

¶27    Furthermore, the record shows that Becker and Hintze had an "opportunity to bargain or negotiate in regard to the exculpatory language in

11

question." *See id.* As noted above, the Release specifically informed Becker and Hintze that, for an additional fee, they could purchase "an optional lift ticket that [would] not require [them] to sign a Release of Liability." In *Schabelski*, this court concluded that a form release sufficiently afforded customers the opportunity to bargain when it "allowed them to select one of two sets of terms: (1) the base ticket price in exchange for the release or (2) a higher ticket price with no release." *Schabelski*, 404 Wis. 2d 217, ¶61. That is precisely what happened here.

¶28 Becker and Hintze nevertheless argue that the Release is unenforceable on public policy grounds for three reasons. First, they contend that Granite Peak's conduct created an unreasonable risk of harm and that the Release is unenforceable when viewed in conjunction with Granite Peak's history of accidents. This argument fails because Becker and Hintze cite no legal authority directly supporting it. In particular, they cite no legal authority supporting their assertion that the Release was required "to alert skiers to the high number of injuries on the jumps at Granite Peak and on the jump in question."

¶29 Instead, Becker and Hintze cite *Richards*, claiming that case requires us to consider "the *totality* of the factors and issues involved" when determining whether a release is enforceable. However, nothing in *Richards* requires a court to consider whether a release informed customers of prior injuries or accidents. Instead, the *Richards* court concluded that the release in that case was unenforceable because: (1) it served two purposes, which were not clearly identified or distinguished; (2) it was "extremely broad and all-inclusive"; and (3) it was a standard agreement on a printed form, which "offer[ed] little or no opportunity for negotiation or free and voluntary bargaining." *Id.* at 1011. The factors that rendered the release in *Richards* unenforceable are not present here.

¶30  Second, and relatedly, Becker and Hintze claim that the Release is misleading because it fails to inform skiers that Granite Peak's jumps are "especially dangerous." (Formatting altered.)  In support of this assertion, Becker and Hintze cite *Eder v. Lake Geneva Raceway, Inc.*, 187 Wis. 2d 596, 523 N.W.2d 429 (Ct. App. 1994).  That case, however, is materially distinguishable.

¶31  In *Eder*, the plaintiffs were injured while watching a motorbike race at Lake Geneva Raceway when one of the vehicles left the racetrack and struck them.  *Id.* at 601-03.  Before the race, both plaintiffs had signed a document purporting to release the track owner from liability for personal injury "whether caused by the negligence of the releasees or otherwise while the undersigned is in or upon the restricted area."  *Id.* at 602-03.  We concluded that the release was unenforceable because the undisputed facts showed that neither plaintiff had a "meaningful opportunity" to read the release before signing it and because the plaintiffs were not "given answers in response to their inquiries about the form."  *Id.* at 606.  We held that, "at a minimum, the plaintiffs should have had an opportunity to read and ask questions about the terms releasing liability."  *Id.* at 607.

¶32  We also concluded that, when signing the release, the plaintiffs "could [not] have contemplated … the risk of a motorbike leaving the track and injuring them, even if they had read the form."  *Id.* at 609.  We noted that the plaintiffs had never been to the racetrack before the accident and "could not have inspected the racetrack grounds before signing because they were not allowed into the grounds unless they signed the form."  *Id.*  We therefore concluded "that the bargain [would] not be enforced simply because of the dangerous nature of the sport.  Significant familiarity with the dangers involved plus knowledge of the

terms of the release are necessary conditions precedent. These conditions are lacking here." *Id.* at 609-10.

¶33    *Eder* is materially distinguishable because, unlike the plaintiffs in that case, there is no evidence that Becker and Hintze were not given the opportunity to read the Release and ask questions regarding its terms before signing it. Moreover, while the plaintiffs in *Eder* had no reason to anticipate the risk of a motorbike leaving the track and injuring them, here, the Release specifically informed Becker and Hintze that ski jumps—including step-down jumps like the one at issue in this case—involve "risks, dangers, and hazards that may cause serious personal injury or death" and that "injuries are a common and ordinary occurrence." Furthermore, it is undisputed that both Becker and Hintze were experienced skiers at the time of their accidents. In addition, Hintze specifically testified at his deposition that he knew on the day of his injury that he could "get hurt" while traversing a ski jump. On this record, there is no basis to conclude that Becker and Hintze lacked "[s]ignificant familiarity with the dangers involved" in traversing ski jumps, even if they were not specifically aware of the number of accidents that had previously occurred on Granite Peak's jumps.[4] *See id.* at 610.

---

[4] Becker and Hintze also assert that, similar to the plaintiffs in *Eder v. Lake Geneva Raceway, Inc.*, 187 Wis. 2d 596, 523 N.W.2d 429 (Ct. App. 1994), they had no opportunity to "inspect the runs or the landing areas before signing" the Release. However, Becker and Hintze have provided no record citation in support of this assertion. In particular, they cite no evidence showing that they asked to perform an inspection before signing the Release and were denied the opportunity to do so.

¶34    Third, Becker and Hintze argue that the Release is overly broad and ambiguous.   In support of this argument, they focus on the paragraph of the Release that states:

> I accept full responsibility for any personal injury which may result from my participation in the sport, and I hereby **HOLD HARMLESS** the GRANITE PEAK RELEASEES for any personal injury sustained by me, including death, caused by the negligence of any GRANITE PEAK RELEASEE while participating in the sport.  **I agree not to bring any action or lawsuit against any GRANITE PEAK RELEASEE for any personal injury caused by the NEGLIGENCE of any GRANITE PEAK RELEASEE.**

Becker and Hintze argue that this language is "confusing" and "purports to release Granite Peak from liability for any reason."

¶35    This court recently rejected the same argument in *Schabelski*, a case involving a nearly identical release that contained the same language quoted in ¶34 of this opinion.  *See Schabelski*, 404 Wis. 2d 217, ¶48.   In *Schabelski*, we concluded that the release, as a whole, was not overly broad or ambiguous.  First, we noted that the release "expressly applie[d] only to negligent conduct" and specifically stated that it should not be construed as releasing any claims based on reckless or intentional acts.  *Id.*, ¶50.

¶36    Second, we reasoned that "rather than asking participants to assume all risks associated with skiing or snowboarding at [the defendant ski hill], the release specifically identifie[d] the categories of negligent conduct which it cover[ed] in the bulleted statements."  *Id.*, ¶51.  We rejected the plaintiffs' argument that the same language quoted in ¶34 of this opinion rendered the release ambiguous or overly broad as to which specific rights and claims were being released.  We explained that that language

15

consists of two sentences that memorialize complementary obligations that ensure compliance with the release. In the first sentence, the [plaintiffs] agree to hold the [releasees] harmless for injuries caused by the releasees' negligence. In the second sentence, the [plaintiffs] promise not to bring a lawsuit against any of the [releasees] for injuries caused by the releasees' negligence.

When read together with the preceding paragraph that contains the actual promise to release from liability, these two sentences impose obligations that correspond to, and are coterminous with, the release obligation. That is to say, the [plaintiffs] (1) agree to release the [releasees] from liability for certain, specified negligent conduct; (2) agree to comply with the release by holding the [releasees] harmless from such negligence liability; and (3) agree not to sue the [releasees] for the negligent conduct that has been released.

*Id.*, ¶¶53-54. Our decision in *Schabelski* forecloses Becker and Hintze's claim that the language quoted in ¶34 of this opinion renders the Release ambiguous or overly broad as to which rights and claims are being released.

¶37 In support of their ambiguity argument, Becker and Hintze also cite the language at the end of the Release stating that the signer acknowledges waiving "certain legal rights" and the right to sue Granite Peak for "certain claims." (Formatting altered.) Becker and Hintze emphasize that the Release fails to define the phrases "certain legal rights" and "certain claims." We agree with Granite Peak, however, that when those phrases are read in context with the rest of the Release, the only reasonable interpretation is that they refer to the right to bring claims against Granite Peak for its negligence with respect to the activities specifically listed in the eight bullet points earlier in the Release.

¶38 Becker and Hintze also claim that the Release is overly broad because its first full paragraph lists "at least fifty-five types of hazards" that are "risks" covered by the Release. (Formatting altered.) Becker and Hintze,

16

however, misread the paragraph in question. The first full paragraph of the Release merely informs the signer that skiing involves certain risks, which may cause serious personal injury or death. That paragraph does not purport to release Granite Peak from liability for each of the risks listed therein. Instead, the next paragraph of the Release specifically sets forth the activities for which the signer releases Granite Peak from liability for its negligence—i.e., the activities enumerated in the eight bullet points.

¶39 For all of these reasons, we conclude that the Release is enforceable and therefore bars Becker and Hintze's claims based on Granite Peak's alleged negligence. We therefore turn to Becker and Hintze's argument that the circuit court erred by granting Granite Peak summary judgment because there is a genuine issue of material fact as to whether Granite Peak engaged in reckless, as opposed to merely negligent, conduct.

## II. Recklessness

¶40 It is undisputed that an exculpatory contract may not release a party from tort liability for reckless conduct. *See **Kellar v. Lloyd***, 180 Wis. 2d 162, 183, 509 N.W.2d 87 (Ct. App. 1993). Recklessness "contemplates a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another." ***Id.*** at 184. "Conduct which creates a high risk of physical harm to another is substantially greater than negligent conduct. Mere inadvertence or lack of skill is not reckless conduct." ***Schabelski***, 404 Wis. 2d 217, ¶43 (citation omitted).

¶41 Whether a defendant's conduct "fulfills a recklessness standard is a question of law," which we review de novo. ***Kellar***, 180 Wis. 2d at 183. In the summary judgment context, this requires us to determine whether the facts, and

any reasonable inferences from those facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable jury to conclude that the defendant acted recklessly. *See Werdehoff v. General Star Indem. Co.*, 229 Wis. 2d 489, 511, 600 N.W.2d 214 (Ct. App. 1999); *Schabelski*, 404 Wis. 2d 217, ¶¶45-46.

¶42    In the circuit court, in support of their recklessness argument, Becker and Hintze relied on a "Summary of Prior Ski Patrol Reports at Granite Peak" from December 7, 2011, through April 9, 2016. Becker and Hintze also submitted an affidavit of Larry Heywood, a "ski hill management and safety expert." Heywood averred that Granite Peak "has a long history of an unusually large number of ski jump injuries on its jumps." More specifically, Heywood averred that "in the four years preceding [Becker's and Hintze's] injuries, there were 372 injuries on jumps at Granite Peak that were serious enough for ski patrol to be called to provide emergency medical services to the injured skiers, including a tragic fatality on one of its ski jumps." Based on Heywood's review of incident reports from the "days and weeks leading up to" Becker's and Hintze's accidents, he also averred that "there were 3 prior ski jump injuries on" the Sky High jump "all caused by the prior ski jumpers overshooting the landing area resulting in head injuries."

¶43    Heywood also opined that the Sky High jump "was originally negligently designed, was inherently dangerous, and was unsafe." He cited the fact that Granite Peak had doubled the length of the deck following Hintze's accident as "further proof that the original design of the jump fell below industry standards." He opined that Granite Peak's failure to "take corrective action to the … jump prior to" Becker's and Hintze's injuries "resulted in a disregard for [Becker's and Hintze's] rights to safety and health." He further opined that had

Granite Peak taken corrective action before Becker's and Hintze's accidents, "this tragedy could have been avoided."

¶44    The circuit court concluded that Becker and Hintze's evidence did not permit a conclusion that Granite Peak had acted recklessly. The court noted that Becker and Hintze's "recklessness argument relied on the number of accidents that had occurred on the jump where both of them were injured." The court concluded, however, that Becker and Hintze's recklessness argument was not supported by the evidence they had submitted. The court explained that Becker and Hintze

> referred to "eight prior injuries on this jump in the same week," but during the week in which [they] were injured …, the summary of ski patrol reports lists only three prior incidents. Even counting back a week from [Becker's and Hintze's] injuries …, the summary lists only seven prior incidents.
>
> And it does say "incidents"—to label them all as "injuries" is not necessarily warranted. (For instance, the description of the second incident on January 2nd says merely "fell upon landing," so to say that anything was injured in that incident beyond the skier's pride is to add facts not contained in the exhibit.)

The court also noted that while Becker and Hintze "asserted that there were three prior ski jump injuries on the same jump that resulted from overshooting the landing, and that all three had head injuries," "the summary of ski patrol reports does not support that assertion. It mentions only two incidents of overshooting the landing, and it does not describe the severity of the injuries, if any." Additionally, for one of those incidents, the ski patrol report merely stated that the skier "came down on his back" without mentioning a head injury.

¶45 The circuit court further reasoned that, "even if there were as many injuries as [Becker and Hintze] assert, the number of injuries is of limited evidentiary value, given that the mere fact of an injury tells us nothing about its cause." The court explained: "[T]he summary of the first incident on January 2nd is illustrative: 'caught edge, fell on top of jump.' So, too, is the second incident on January 3rd: 'attempted to stop unsuccessfully prior to jump, fell upon landing.' Granite Peak cannot be responsible for errors by other skiers."

¶46 On this record, the circuit court concluded that Granite Peak's conduct did not "rise above the level of negligence (if that), and thus [fell] short of qualifying as reckless." The court explained that the evidence submitted by Becker and Hintze did not "support the conclusion that Granite Peak consciously disregarded an unreasonable and substantial risk of serious bodily harm to another."

¶47 We agree with the circuit court's analysis. Becker and Hintze rely on the summary of ski patrol reports and on Heywood's affidavit. But Heywood simply looked at the ski patrol reports from Granite Peak and counted the number of "incidents" that were reported on its jumps. Heywood did not consider the particular jump that each skier was using at the time of each incident. As such, he did not analyze the design of the jumps involved in the reported incidents—not all of which occurred on the jump at issue in this case. More importantly, Heywood did not attempt to analyze the causes of any of the incidents. For instance, he did not consider the skill of each individual skier, the speed at which each skier took the jump, whether the skier was attempting a trick beyond his or her ability, or whether the skier took the jump at the wrong angle.

20

¶48   As Granite Peak correctly notes, "[t]he fact [that] a skier is injured on a jump tells us nothing about the design[,] construction or maintenance of the jump or … the cause of the accident." We agree with Granite Peak and the circuit court that, without additional information regarding the circumstances surrounding the reported incidents, the mere number of incidents that were reported on Granite Peak's jumps would not permit a reasonable jury to conclude that Granite Peak acted recklessly—as opposed to merely negligently—with respect to the design, construction, and maintenance of the Sky High jump.

¶49   Becker and Hintze argue that the circuit court's analysis was flawed because the court failed to draw all reasonable inferences in their favor. We disagree. The court accepted Becker and Hintze's evidence regarding the number of prior incidents that had occurred on Granite Peak's ski jumps. The court simply concluded that their evidence, given the deficiencies discussed above, was insufficient to establish recklessness as a matter of law. Stated differently, the court concluded that Becker and Hintze's evidence would not permit a reasonable jury to conclude that Granite Peak acted recklessly. *See Werdehoff*, 229 Wis. 2d at 511. For the reasons explained above, we agree with the court's conclusion in that regard.

¶50   Becker and Hintze also argue that the circuit court improperly placed the burden on them to prove, on summary judgment, that Granite Peak's conduct was not reckless. Again, we disagree. As the moving party, it was Granite Peak's responsibility to make a prima facie case for summary judgment. *See Preloznik v. City of Madison*, 113 Wis. 2d 112, 116, 334 N.W.2d 580 (Ct. App. 1983). On appeal, Becker and Hintze do not develop any argument that Granite Peak failed to do so. As a result, the burden shifted to Becker and Hintze "to prove that there [were] no genuine issues of material fact" as to whether Granite Peak acted

21

recklessly. *See Central Corp. v. Research Prods. Corp.*, 2004 WI 76, ¶19, 272 Wis. 2d 561, 681 N.W.2d 178.  As explained above, the evidence submitted by Becker and Hintze failed to meet that standard.

¶51  Becker and Hintze also argue that Heywood's opinion created a genuine issue of material fact regarding whether Granite Peak acted recklessly. They cite *Mettler ex rel. Burnett v. Nellis*, 2005 WI App 73, ¶11, 280 Wis. 2d 753, 695 N.W.2d 861 (citation omitted), where this court stated, "[A]t summary judgment, an 'affidavit setting forth the expert's opinion is evidence of a factual dispute' as long as 'the opinion is expressed on a matter that is appropriate for expert opinion and the affiant is arguably an expert....'"[5]

¶52  As noted above, however, to survive summary judgment, the nonmoving party must show the existence of a *genuine* issue of material fact. WIS. STAT. § 802.08(2); *Central Corp.*, 272 Wis. 2d 561, ¶19.  A factual issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶32, 236 Wis. 2d 435, 613 N.W.2d 142.  As already explained, Heywood's opinion would not have permitted a reasonable jury to conclude that Granite Peak acted recklessly.  As such, it did not create a genuine issue of material fact requiring a trial.

---

[5] In support of their argument that Heywood's opinion created a genuine issue of material fact, Becker and Hintze also cite an unpublished, per curiam opinion that was issued by this court in 1990.  That citation clearly violates WIS. STAT. RULE 809.23(3).  We admonish Becker and Hintze's attorney that future violations of the Rules of Appellate Procedure may result in sanctions.  *See* WIS. STAT. RULE 809.83(2).

¶53 Finally, Becker and Hintze repeatedly emphasize the fact that, following Hintze's accident, Granite Peak doubled the length of the deck for the Sky High jump. However, "[w]hen, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence *or culpable conduct* in connection with the event." WIS. STAT. § 904.07 (emphasis added). Becker and Hintze cite no legal authority to support a conclusion that evidence of Granite Peak's modification of the Sky High jump following Hintze's accident would have been admissible to show that Granite Peak acted recklessly.

¶54 Based upon the foregoing, we conclude the circuit court properly determined that Becker and Hintze failed to present sufficient evidence to establish the existence of a genuine issue of material fact regarding whether Granite Peak acted recklessly. Consequently, the court properly granted Granite Peak's motion for summary judgment and dismissed all of Becker and Hintze's claims.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.